**UNITED STATES v. CARPER et al.**

Crim. A. No. 836–52.

United States District Court
District of Columbia.

Jan. 14, 1953.

484

Charles M. Irelan, U. S. Atty., and Robert Ackerly, Asst. U. S. Atty., Washington, D. C., for plaintiff.

Myron Ehrlich, Washington, D. C., for defendants.

MATTHEWS, District Judge.

The matter before the court is a motion for change of venue. The defendants heretofore moved for a venue change, claiming that widespread hostile publicity had impregnated the whole community with prejudice against them. The government opposed the motion, and a hearing was held. The court denied the motion but without prejudice to its renewal if upon the *voir dire* examination at the time set for trial it should then appear that an impartial jury cannot be obtained. Without waiting for that time, however, the defendants have renewed the motion for a change of venue, alleging in support thereof grounds additional to those set forth at the first hearing. It is the renewed motion (hereinafter referred to as the motion) that is now before the court.

In the indictment, returned May 23, 1952, the defendants are charged under Title 18, Section 371, of the United States Code with conspiracy to commit offenses against the United States by violating the Federal narcotic laws, and under Title 22, Section 704 of the District of Columbia Code with accepting bribes to influence their official action in the detection and arrest of violators of the narcotic laws, both defendants being police officers of the District of Columbia at all times mentioned in the indictment.

Rule 21(a) of the Federal Rules of Criminal Procedure, under which the motion is made, provides:

"The court upon motion of the defendant shall transfer the proceeding as to him to another district or division if the court is satisfied that there exists in the district or division where the prosecution is pending so great a prejudice against the defendant that he cannot obtain a fair and impartial trial in that district or division."

The defendants ask that prejudice be inferred from the publicity they have received. Primarily the publicity involved has for its background certain Senate Committee hearings.

Pursuant to a Senate Resolution [1] to investigate crime and law enforcement in the District of Columbia a subcommittee of the Senate Committee on the District of Columbia held public hearings at intervals during the first six months of 1952. The expiration date of the authority of the subcommittee was June 30, 1952. Because of the limitations of time, the subcommittee concentrated on police performance. The Superintendent of Police and various officers in key posts including the defendant Carper were among the witnesses called. The exhibits submitted by defendants show that Mr. Carper testified on March 17 and from that time through March 25 he was among those figuring prominently in the publicity coverage of the hearings, including telecasts, radio broadcasts and the press, local and national. The defendants say, first, that the widely publicized testimony of some of the witnesses at the hearings "is the same testimony the prosecution will use at the trial" and that over the radio and television subcommittee members indicated that defendants are guilty not only of the

1. S.Res. 136 as amended by S.Res. 267, 82d Congress.

charges later included in the indictment but of other violations of law. This publicity, defendants assert, created a public preconception of guilt.

Second, the defendants maintain that after their indictment on May 23, 1952, public prejudice was created against them by the wide circulation of the report of the subcommittee.[2] It was released late in June just before the expiration of the authority of the subcommittee on June 30, 1952 and about a week prior to the adjournment *sine die* of the 82d Congress. The defendants are referred to in 5 pages of the 36 page report. It summarizes the testimony and sets forth the conclusions and recommendations of the subcommittee. The report indicates the feeling of the subcommittee from the evidence that the defendants had protected narcotics sellers. The defendants failed to support by evidence their allegation that the report was widely distributed by the subcommittee and by the Government Printing Office. It was established that the text of the report was printed in the leading Washington newspapers and that concurrently therewith the report was commented on in newspaper articles and in radio and television coverage. However, such newspaper, radio and television coverage was limited to one day or two days at the most. At the time publicity facilities were deluged with news of the forthcoming conventions for the nominations of presidential candidates.

Thirdly, the defendants complain of magazine articles as engendering public prejudice against them. In this connection four magazines were received in evidence. In only two of these is there specific mention of either defendant. The September 27, 1952, issue of "The Saturday Evening Post" has a 9 page article entitled "They Got the Goods on Washington's Cops". It prominently mentions the defendant Carper and displays his picture. The November 1952 issue of "True Police Cases" carries an article headed "Sin and Crime in Washington, D. C." On one page is a pic-

ture of Mr. Carper, and on two others his name is mentioned.

Lastly, the defendants complain of hostile publicity of a date subsequent to the first hearing on the request for a change of venue. It appears that a criminal trial (in which neither of the defendants here were charged) was in progress in this District. The charge was conspiracy to violate the narcotic laws. Several witnesses therein gave testimony as to alleged conversations with Mr. Carper concerning police protection for narcotics peddlers. The local newspapers then gave publicity to that testimony. The majority of the exhibits submitted in support of this last contention concern this publicity. They show that up to November 21, 1952 there had been eight days on which news accounts appeared mentioning statements of witnesses at the narcotic conspiracy trial concerning Mr. Carper. Of the remainder of the exhibits, two consist of articles concerning the motion herein for change of venue, three are accounts of the narcotic conspiracy trial in which no specific mention of defendants is made, and one is a feature article entitled "Crime Quiz Lowered Boom on Lieutenant Carper in Drug Case." It refers back to the subcommittee hearings, quotes Mr. Carper as having testified there that the narcotic problem was "almost nonexistent from October 1947 until October 1949" and as denying that he had ever been paid by a dope peddler. It also quoted witnesses at the hearing to the effect that bribes had been paid.

The defendants rely heavily on the case of Delaney v. United States, 1 Cir., 1952, 199 F.2d 107, 115. Unlike the present case, there the motion was for a continuance, not for a change of venue. The court held that in order to assure the defendant of a fair trial the trial should have been postponed until by lapse of time the danger of prejudice to him from adverse publicity could have been substantially removed.

It is always incumbent on the judiciary to see that each defendant is afforded his con-

2. Senate Report No. 1989 82d Congress, 2d Session.

stitutional right to a fair and impartial trial. The circumstances in the Delaney case, however, are quite different from those in the instant case. Mr. Delaney had been indicted, and all the proceedings of the congressional committee concerning him took place after his indictment. The defendants here were not under indictment during the proceedings before the subcommittee concerning them except that the report of the subcommittee was released after their indictment. In that connection, the court in the Delaney case said:

"We limit our discussion to the case before us, and do not stop to consider what would be the effect of a public legislative hearing, causing damaging publicity relating to a public official not then under indictment. Such a situation may present important differences from the instant case. In such a situation the investigative function of Congress has its greatest utility: Congress is informing itself so that it may take appropriate legislative action; it is informing the Executive so that existing laws may be enforced; and it is informing the public so that democratic processes may be brought to bear to correct any disclosed executive laxity. Also, if as a result of such legislative hearing an indictment is eventually procured against the public official, then in the normal case there would be a much greater lapse of time between the publicity accompanying the public hearing and the trial of the subsequently indicted official than would be the case if the legislative hearing were held while the accused is awaiting trial on a pending indictment."

It is also pointed out by the court in the Delaney case that the United States, through its legislative department by means of an open committee hearing held shortly before the trial of a pending indictment, caused and stimulated massive pre-trial publicity, on a nationwide scale over a sustained period. The court felt that where the public interest required a committee of Congress to thus proceed then the United

States should accept the consequence that the judicial department, charged with the duty of safeguarding the right of a defendant to an impartial trial, might find it necessary to delay the trial.

In the instant case most of the publicity concerned the hearings which took place while the defendants were not under indictment. Although the report of the subcommittee was released after the indictment, the portion of it concerning defendants was a report of hearings held prior to their indictment, and the publicity incident to the report was confined to one or two days at the most.

The time of trial in relation to the time of the publicized legislative hearings is another factor distinguishing the Delaney case from the instant case. When Mr. Delaney was forced to trial it was within three months of the congressional committee hearings. In the instant case more than nine months have passed since the subcommittee hearings concerning the defendants and over six months have elapsed since the release of the report of the subcommittee and still the trial of Mr. Carper and Mr. Taylor has not been reached. These observations do not by any means exhaust the field of differentiation between the two cases.

Under facts somewhat similar to those in the instant case, the United States Court of Appeals for the Second Circuit affirmed a denial of a motion to postpone. United States v. Moran, 1952, 194 F.2d 623, certiorari denied 343 U.S. 965, 72 S.Ct. 1058, 96 L.Ed. 1362. There the court found that the voir dire examination of the prospective jurors showed that the apprehension of defendant's counsel that an impartial jury could not be secured was unjustified. Defendant therein had been indicted for perjury in testifying falsely in March, 1951 before a subcommittee of the United States Senate's Special Committee to Investigate Organized Crime in Interstate Commerce. The trial commenced on May 3. On May 1, the report of the committee before which defendant had appeared was released for publication in the press and in said report

defendant was mentioned numerous times. His counsel contended that because of the issuance of the report, and the widespread publicity by radio and television given to the hearings at which defendant testified, it would be impossible to get a jury uninfluenced by the adverse publicity, and moved for a continuance until the October term. No request for change of venue was made. The motion was denied. It appears that on the voir dire examination, only 27 talesmen were questioned before a jury satisfactory to both sides was secured. Moreover, of the twelve jurors chosen, only two had read anything about the case in the newspapers, and two had seen part of the hearings on television, but no part relating to the defendant.

When on July 7, 1952, the defendants first moved for a change of venue they sought a transfer to Alexandria, Virginia.[3] That city is within about 10 miles of and has the same radio, television and press coverage as Washington, D. C. On November 3, 1952—about four months after the request for trial in Alexandria and before any action had been taken on that request—the defendants by an amended venue motion widened the area of alleged prejudice to include not merely the District of Columbia but all Federal districts in close proximity thereto, without, however, naming them. Moreover, although the defendants have been afforded ample opportunity so to do, they have failed to inform the court of any district or districts which they deem free of the alleged prejudice and to which they desire the case transferred for trial, and so as the case now stands if the venue were changed to another district there is no assurance that the defendants would regard it as free of public prejudice and hence might then embark upon an effort to change the changed venue. The court inquired of counsel for defendants if a postponement of the trial would suffice and he responded that he was not then moving for a postponement.

It is the view of the court that the apprehension of the defendants herein that prejudice against them is so great as to preclude a fair trial in the District of Columbia is based upon conjecture and speculation. "The way is open in every case to raise a contention of bias from the realm of speculation to the realm of fact." Dennis v. United States, 339 U.S. 162, 168, 70 S.Ct. 519, 521, 94 L.Ed. 734. At the empaneling of the jury, the defendants will have an opportunity to prove actual bias, and thus their right to an impartial jury is guaranteed.

The court believes that there can be secured with reasonable certainty from the more than 800,000 citizens in the District of Columbia a jury whose members will be able to try the case solely upon the evidence as adduced at the trial, and upon the law as given by the court. The motion for a change of venue is denied without prejudice to its renewal if, upon the *voir dire* examination, it appears that an impartial jury cannot be secured. The case is set for trial on April 20, 1953.

---

3. The Alexandria Division of the United States District Court for the Eastern District of Virginia.