STATE OF WEST VIRGINIA

*v.*

ROBERT FRAZIER

(No. 13900)

Decided February 6, 1979.

*Valentine, Wilson & Partain, William G. Wilson and Eric H. O'Briant* for plainfiff in error.

*Chauncey H. Browning*, Attorney General, *Gregory W. Bailey*, Assistant Attorney General, for defendant in error.

MILLER, JUSTICE:

Robert Frazier, a high school teacher in Logan County, appeals his conviction of the felony of delivering marijuana to one of his students.[1]

He assigns as principal errors that the grand jury proceeding was vitiated when a State trooper was permitted to remain in the grand jury room after he testified and participated in the interrogation of other witnesses who gave evidence against the defendant; that the trial court erred in admitting the results of a lie detector test taken by the defendant; that the State failed in its proof of the crime; and that under the principles of double jeopardy, a judgment of acquittal is warranted. We agree that reversible error was committed, but decline to apply the Double Jeopardy Clause.

I

UNAUTHORIZED PERSON BEFORE GRAND JURY

Prior to trial, counsel for Frazier filed a motion to quash and a plea in abatement with respect to the indictment. Both were on the ground that a State trooper, who had investigated the presence of drugs at or around the high school, was in the grand jury room when witnesses were testifying against the defendant and assisted the prosecution in interrogating these witnesses.

In the order overruling the motion and plea, the trial court found the following facts: (1) the State trooper "aided the assistant prosecuting attorney and the Grand Jurors in questioning ... witnesses;" (2) the trooper had been "investigating alleged drug traffic in and around the ... High School where the defendant was a teacher and the witnesses were students;" (3) the trooper had been a duly sworn witness before the grand jury;

---

[1] W.Va. Code, 60A-4-401(a)(1)(ii) and 60A-2-204(d)(10).

and (4) both he and the assistant prosecutor "left the Grand Jury room before the Grand Jury began its deliberations concerning the resulting indictment."

The court concluded that "while not approving of the trooper's questioning of the said witnesses," it "[could not] find that the defendant's rights were thereby violated or that there was any prejudice to the defendant."

The rule in West Virginia as to the legal effect of the appearance of an unauthorized person before a grand jury is stated in Syllabus Point 4 of *State v. Wetzel*, 75 W. Va. 7, 83 S.E. 68, 1918A Ann. Cas. 1074 (1914):

> "It is the policy of the law to preserve inviolate the secrecy of proceedings before the grand jury, and the discussion of evidence before them, relating to an alleged crime which they are then considering, by persons not sworn to testify as witnesses, will vitiate an indictment returned by them whether they were actually influenced by such discussion or not. The law seeks to guard against even the possibility of such influence."

The grand jurors in *Wetzel*, who were considering among other crimes the charge of embezzlement against the defendant, adjourned to the bank where the embezzlement occurred, and there discussed some of the matter with employees of the bank. The indictment founded on such procedures was quashed. *Wetzel's* rule was quoted with approval in *State ex rel. Matko v. Ziegler*, 154 W. Va. 872, 881, 179 S.E.2d 735, 741 (1971), *overruled on other grounds, Smoot v. Dingess,* ____ W. Va. ____, 236 S.E.2d 468, 472 (1977).

*Wetzel* also recognized that while the grand jury is considering the evidence, other witnesses are not permitted to be in the grand jury room and no one can be present when it is actually voting on the indictment:

> "The law holds inviolate the secrecy of proceedings before the grand jury. No one is permitted to be present, when they are voting on an indictment, not even the prosecuting attorney, or the judge of the court, and no person, *not a witness*

*sworn and sent before them to give evidence,* or the prosecuting attorney for the purpose of advising them upon questions of law only, is permitted to be present at any time while they are considering evidence." [75 W. Va. at 14, 83 S.E. at 71, 1918A Ann. Cas. at ___] [Emphasis supplied]

Obviously, a witness summoned to appear before the grand jury is authorized to give evidence to it. It is equally clear under *Wetzel* that once he performs this task he cannot remain in the grand jury room and participate in the interrogation of other witnesses. This occurred in the present case, and at the point that the State trooper completed his testimony and embarked upon interrogation of other witnesses, he became an unauthorized person.

The basis for the *Wetzel* rule is not difficult to understand. It is to guard against the possibility of influencing the grand jurors. It cannot be expected that law enforcement officials who are directly involved with the solution of a crime and the prosecution of its perpetrators will maintain an impartial role.

A number of authorities are cited by *Wetzel* for its rule. There seems to be general agreement that while a law enforcement official may properly be a witness before the grand jury, he must limit himself to the role of witness and cannot participate in questioning witnesses. *Culbreath v. State,* 22 Ala. App. 143, 113 So. 465 (1927); *Moseley v. State,* 256 Ark. 716, 510 S.W.2d 298 (1974); *Herrington v. State,* 98 Miss. 410, 53 So. 783 (1910); *see United States v. Carper,* 116 F. Supp. 817, 13 F.R.D. 483 (D. D.C. 1953); Annot., 4 A.L.R.2d 392, 423 (1949); *cf. United States v. Edgerton,* 80 F. 374 (D. Mont. 1897) (expert witness, who was not a policeman, held unauthorized).

*Wetzel* recognized, as do we, that some of its cited authority involved statutes setting the rule, but such statutes were merely "declaratory of the common law." [75 W. Va. at 15, 83 S.E. at 72]

Illustrative of the common law origin of the rule is the case of *United States v. Edgerton, supra,* where an expert witness, who was not a police officer, remained in the jury room questioning other witnesses:

> "It is beyond question that no person, other than a witness undergoing examination, and the attorney for the government, can be present during the sessions of the grand jury. The rule is inherent in the grand jury system with all the force of a statutory enactment. . . . The case as presented is one where an expert was not only present in the grand jury room while a witness was testifying, but took part in the investigation by interrogating the witness. The court cannot inquire as to the effect of this conduct. There must not only be no improper influence or suggestion in the grand jury room, but, as suggested in Lewis v. Commissioners, 74 N.C. 194, there must be no opportunity therefore. If the presence of an unauthorized person in the grand jury room may be excused, who will set bounds to the abuse to follow such a breach of the safeguards which surround the grand jury?" [80 F. at 375]

*United States v. Echols,* 542 F.2d 948 (5th Cir. 1976), recognizes that the broad investigative powers lodged with a grand jury permit it to have all types of evidence, from expert testimony to physical or demonstrative evidence. *Echols* also recognizes the general federal rule that it is improper to permit the simultaneous presence of a testifying witness and an unauthorized person before the grand jury. The court cited its earlier case of *Latham v. United States,* 226 F. 420 (5th Cir. 1915), for the following principle:

> "[T]he presence of an unauthorized person results in a *per se* invalidity of the indictment. No showing of prejudice is required to quash an indictment secured with the presence of unauthorized persons in the grand jury room." [542 F.2d at 951]

This is essentially the same rule that we have adopted in *Wetzel.* The rule does not restrict any legitimate exer-

cise of the broad investigatory powers of the grand jury. Its purpose is to prevent undue influence or intimidation from infecting the grand jurors.

In the present case, not only was the witness unauthorized when he had completed his testimony and remained in the grand jury room, but error was compounded when he questioned other witnesses who appeared before the grand jury.

We need not assess the outer limits of the *Wetzel* rule to speculate whether it would apply to some innocuous, accidental intrusion into the grand jury room by an unauthorized person. We hold that an indictment will be vitiated where a witness completes his testimony but remains in the grand jury room while other witnesses are testifying and participates in questioning such witnesses.

## II
## ADMISSIBILITY OF POLYGRAPH TEST

The defendant Frazier submitted to a polygraph test prior to trial pursuant to a written stipulation signed by him, his counsel, and the prosecutor. Its material terms were as follows: "[T]hat a member of the West Virginia Department of Public Safety [would] conduct a polograph [*sic*] test or tests on ... Robert Frazier with a view to determining whether Robert Frazier did deliver a controlled substance to Kenneth Morgan as alleged. ..."

The stipulation provided that the test results, together with the opinion of the polygraph operator, would be "admissible in court either for or against the said Robert Frazier upon the trial of the said indictment." The stipulation also stated it would have "no force and effect" and the test results would be inadmissible "for or against Robert Frazier ... if in the opinion of the polygraph operator the test results are not valid for any reason whatsoever. ..."

The State called the polygraph expert as a part of its case-in-chief. He stated the test showed the defendant

lied when, during the course of the test, he denied delivering marijuana. After cross-examining the expert, Frazier's counsel moved to strike his evidence.

The admissibility of the results of a polygraph test is a subject of continuing legal controversy. Without attempting an exhaustive analysis of all aspects of this controversy, we will trace its essential historical outlines.

The general rule flowing from the case of *Frye v. United States*, 54 U.S. App. D.C. 46, 293 F. 1013, 34 A.L.R. 145 (D.C. Cir. 1923), is that such results are not admissible. The predicate for the rule is the questionable scientific accuracy of the test. *See, e.g., United States v. Tremont*, 351 F.2d 144, 146 (6th Cir. 1965), *cert denied*, 383 U.S. 944, 16 L. Ed. 2d 207, 86 S.Ct. 1198 (1966); *McCroskey v. United States*, 339 F.2d 895, 897 (8th Cir. 1965); *Marks v. United States*, 260 F.2d 377, 382 (10th Cir. 1958), *cert. denied*, 358 U.S. 929, 3 L. Ed. 2d 302, 79 S.Ct. 315 (1959); *United States v. Bando*, 244 F.2d 833, 841 (2nd Cir. 1957), *cert. denied*, 355 U.S. 844, 2 L. Ed. 2d 53, 78 S.Ct. 67 (1957); *Tyler v. United States*, 90 U.S. App. D.C. 2, 9, 193 F.2d 24, 31 (D.C. Cir. 1951), *cert. denied*, 343 U.S. 908, 96 L. Ed. 1326, 72 S.Ct. 639 (1952); *Sullivan v. State*, 303 So.2d 632, 634-35 (Fla. 1974), *cert. denied*, 428 U.S. 911, 49 L. Ed. 2d 1220, 96 S.Ct. 3226 (1976); *Smith v. State*, 20 Md. App. 577, 593-96, 318 A.2d 568, 579-80 (1974), *cert. denied*, 420 U.S. 909, 42 L. Ed. 2d 839, 95 S.Ct. 828 (1975); *People v. Barbara,* 400 Mich. 352, 255 N.W.2d 171 (1977) (not admissible at trial; may be on motion for new trial); *Harrison v. State*, 307 So.2d 557, 562 (Miss. 1975); *Warden, Nevada State Prison v. Lischko*, 90 Nev. 221, 224, 523 P.2d 6, 8 (1974); *State v. Jackson*, 287 N.C. 470, 480, 215 S.E.2d 123, 129-30 (1975); *Fulton v. State,* 541 P.2d 871 (Okla. Crim. 1975); *Commonwealth v. Brooks*, 454 Pa. 75, 309 A.2d 732, 733-34 (1973); *State v. Woo*, 84 Wash. 2d 472, 527 P.2d 271 (1974).

The advocates of the admissibility of polygraph test results have spent the intervening years since *Frye* at-

tempting to demonstrate reliability of polygraphic tests.[2] There is a considerable body of studies and statistics suggesting that in the hands of an experienced operator, substantially accurate test results can be obtained.[3] A major difficulty with these statistics, however, is that they lack any independent verification of the operator's judgment, and they contain the further statistical flaw that even where some verification is present, the verified cases are not separated from the unverified.[4]

---

[2] G. Barland, in N. Ansley, *Legal Admissibility of the Polygraph* (1975), at 121 [hereinafter Ansley], draws a distinction between reliability and validity which is often overlooked:

*"Validity* refers to *accuracy:* the ability of a test to measure or predict accurately what it is supposed to measure or predict.... *Reliability,* on the other hand, doesn't refer to accuracy at all. Rather, reliability refers to *consistency:* the ability for the same results—whether correct or not—to be obtained each time the test is given...." [Emphasis in original]

[3] *See, e.g.,* Cureton, *A Consensus as to the Validity of Polygraph Procedures,* 22 Tenn. L. Rev. 728, 729 (1953) (3% error); Pfaff, *The Polygraph: An Invaluable Judicial Aid,* 50 A.B.A.J. 1130, 1132 (1964) (1% error); Wicker, *The Polygraphic Truth Test and the Law of Evidence,* 22 Tenn. L. Rev. 711, 713 (1953) (2-5% error); Note, *The Polygraph and Probation,* 9 Idaho L. Rev. 74, 75-76 (1972) (5% error).

[4] G. Barland, in Ansley, *supra* note 3, at 155, after referring to his prior extensive review of a number of polygraph reliability studies, makes this point:

"In addition to occasional arithmetical errors, none of the reports give any vital details as to the methods used during the examinations, what criteria have been used to validate the examiner's decision, whether it is the examiner himself or someone else who decides when his decision is confirmed or disconfirmed, etc. In talking with field examiners, I have found that many of them automatically consider their decisions verified, usually by the behavorial symptoms of the suspects, unless positive information to the contrary is somehow brought to their attention. All too rarely is there an organized effort made by the examiner to actively follow up the examination....

"In all of the reports of accuracy published by the field examiners, there is a major procedural error which completely destroys the value of the statistics. The error rate is obtained by dividing the number of errors by the total number of examinations conducted. However, the examinations which an examiner has conducted can be sorted into two groups; those in which the examiner's decision is confirmed or disconfirmed independently of the polygraph

A polygraph test involves two main components. First, the machine itself, which registers various physiological changes in the subject, i.e., breathing, heartbeat, blood pressure and galvanic skin reflex, as he responds to questions. Second, the interpretation of these responses, as recorded by the machine, by its operator. Overlaid on this latter component may be the operator's method of structuring the test and his direct observations of the individual while taking the testimony. The operator's interpretation of the test result is a factor of some significance.[5]

---

examination, and those in which there is no way to determine if the examiner is right or not. Since all known errors are confined to only the verified group, dividing the known errors by both the verified and the unverified cases distorts the resultant statistic and makes the polygraph technique appear more accurate than it may be...."

[5] (a) As to the operator's role, see Radek, *The Admissibility of Polygraph Results in Criminal Trials: A Case for the Status Quo*, 3 Loyola U.L.J. 289 (1972).

(b) John E. Reid, an acknowledged authority, made the following comment in Ansley, *supra* note 3, at 229:

"I estimate that in 25 percent of the subjects tested, deception is clearly indicated on the record, but 65 percent of the times, the records are very difficult to read. They need all the expertise in the world to interpret them. It is the 65 percent of the test records, the ones that are very difficult to interpret that actually require special conditioning and stimulation for the under-responsive and destimulation for the overly responsive, including Guilt Complex tests for subjects who may be false responders. In about ten percent of the subjects tested, no decision can be made from the Polygraph records because of some physical, mental, or emotional defect...."

(c) G. Barland, reporting in Ansley, *supra* note 3, at 123, as to a controlled laboratory test on 72 subjects, used a scale evaluation for truthfulness or deception. As he noted:

"The fact that the evaluations are expressed as numerical scores along a continuum rather than dichotomous decisions of *truthful* or *deceptive* probably doesn't strike you as being very important...." [Emphasis in original]

This procedure changes truth or lie from a dichotomous system to a subjective valuation along a scale. The word "lie" is now replaced by the more euphemistic term "deception," further increasing the subjective interpretation of the test. This appears to undercut the entire basis of the polygraph test in that it contains a series of single factual questions that are to be answered either "yes" or

Perhaps as a result of the lack of any substantial study independently verifying the accuracy of the polygraph, along with the subjective influence of the operator and the legal problems discussed hereafter, no appellate court has sanctioned the introduction of the polygraph test under the same rules of evidence which govern scientific tests.

Some courts have adopted the approach of *State v. Valdez*, 91 Ariz. 274, 371 P.2d 894 (1962), which permitted the admission of the polygraph test by written stipulation of the parties under the following conditions:

> "(1) That the county attorney, defendant and his counsel all sign a written stipulation providing for defendant's submission to the test and for the subsequent admission at trial of the graphs and the examiner's opinion thereon on behalf of either defendant or the state.

> "(2) That notwithstanding the stipulation the admissibility of the test results is subject to the discretion of the trial judge, i. e. if the trial judge is not convinced that the examiner is qualified or that the test was conducted under proper conditions he may refuse to accept such evidence.

> "(3) That if the graphs and examiner's opinion are offered in evidence the opposing party shall have the right to cross-examine the examiner respecting:

> "a. the examiner's qualifications and training;

> "b. the conditions under which the test was administered;

---

"no." This is done in order to narrow the interpretation of the physiological response to a "true" or "false" context.

Barland's own evaluation of the validity or accuracy of his polygraph tests on the 72 subjects was:

"For example, at the time I examined these 72 Subjects, I made a decision as to their truthfulness. Using cut-off points of ±4, inclusive, for the inconclusive region, I ended up with 53 percent correct decisions, twelve percent incorrect decisions, and 35 percent inconclusives."

"c. the limitations of and possibilities for error in the technique of polygraphic interrogation; and

"d. at the discretion of the trial judge, any other matter deemed pertinent to the inquiry.

"(4) That if such evidence is admitted the trial judge should instruct the jury that the examiner's testimony does not tend to prove or disprove any element of the crime with which a defendant is charged but at most tends only to indicate that at the time of the examination defendant was not telling the truth. Further, the jury members should be instructed that it is for them to determine what corroborative weight and effect such testimony should be given." [91 Ariz. at 283-84, 371 P.2d at 900-901][6]

There are several problems arising from the *Valdez* concept. Its central thesis of admissibility is the written stipulation.[7] Yet, it is clear that by written stipulation

---

[6] Cases substantially following *Valdez* are:

*United States v. Oliver,* 525 F.2d 731 (8th Cir. 1975), *cert. denied,* 424 U.S. 973, 47 L. Ed. 2d 743, 96 S.Ct. 1477 (1976); *Johnson v. State,* 166 So.2d 798 (Fla. App. 1964) (by implication); *State v. Chambers,* 240 Ga. 76, 239 S.E.2d 324 (1977); *People v. Zazzetta,* 27 Ill. 2d 302, 189 N.E.2d 260 (1963); *Carpenter v. State,* 251 Ind. 428, 241 N.E.2d 347 (1968); *State v. Lassley,* 218 Kan. 758, 545 P.2d 383 (1976); *Colbert v. Commonwealth,* 306 S.W.2d 825, 71 A.L.R.2d 442 (Ky. 1957), *overruled on other grounds sub nom. Preston v. Commonwealth,* 406 S.W.2d 398, 403, A.L.R.3d 1387, 1396 (Ky. 1966), *cert. denied,* 386 U.S. 920, 17 L. Ed. 2d 792, 87 S.Ct. 886 (1967); *Commonwealth v. A Juvenile,* 365 Mass. 421, 313 N.E.2d 120 (1974); *State v. McDavitt,* 62 N.J. 36, 297 A.2d 849 (1972); *State v. Steele,* 27 N.C. App. 496, 219 S.E.2d 540 (1975); *State v. Towns,* 35 Ohio App. 2d 237, 64 Ohio Ops. 2d 371, 301 N.E. 2d 700 (1973); *State v. Bennett,* 17 Or. App. 197, 521 P.2d 31 (1974); *State v. Ross,* 7 Wash App. 62, 497 P.2d 1343, 53 A.L.R.3d 997 (1972); *State v. Stanislawski,* 62 Wis. 2d 730, 216 N.W.2d 8 (1974); *see* Annot., 53 A.L.R.3d 1005 (1973).

[7] *State v. Treadaway,* 116 Ariz. 163, 568 P.2d 1061 (1977), makes this abundantly clear when the court, in an *en banc* opinion, upheld the rejection of the defendant's three proffered polygraph experts' testimony, each of whom had separately tested him. The court stated:

"Furthermore, we believe the polygraph report of the Committee on Government Operations of the United States House of Repre-

parties cannot make evidence admissible that otherwise would be inadmissible. In other words, a written stipulation agreeing to the introduction of certain evidence is not the legal basis for its admissibility. *Pulakis v. State*, 476 P.2d 474, 479 (Alaska 1970) (polygraph test stipulation); 29 Am. Jur. 2d *Evidence* § 13.

It is true that *Valdez* and its progeny suggest that the examiner's testimony concerning the polygraph test bears upon the truthfulness of the subject's testimony, and therefore his credibility. Yet, if this were the real basis for its admissibility, there would be no need for the written stipulation, since it is generally held that any witness' credibility may be impeached. *State v. Justice* 135 W. Va. 852, 65 S.E.2d 743 (1951); *Moore v. Skyline Cab, Inc.*, 134 W. Va. 121, 59 S.E.2d 437 (1950); *State v. Crummit*, 123 W. Va. 36, 13 S.E.2d 757 (1941); 81 Am. Jur. 2d *Witnesses* § 518; 98 C.J.S. *Witnesses* § 458.

However, if the test bore merely on the issue of credibility, it would ordinarily not be admissible unless the defendant took the witness stand. Most cases that follow the *Valdez* stipulation, and *Valdez* itself, do not discuss, much less differentiate between, whether the test can be introduced in the state's case-in-chief or only for the impeachment of the defendant.

One court has held that it can be used in the state's case-in-chief. In *State v. Baskerville*, 139 N.J. Super. 389, 393-94, A.2d 328, 330 (1976), the court seized on the language of the stipulation, which stated that the results could be "used against" the defendant, as being sufficiently broad to admit the results whether he testified or not. However, *Baskerville* does not discuss *State v.*

---

sentatives is persuasive concerning the insufficient reliability of polygraph technology.

" 'Although there is indication that efforts are being made to upgrade the training and educational requirements of polygraph operators, the committee finds that unproven technical validity of the polygraph devices themselves makes such efforts a meaningless exercise.' Committee on Government Operations, The Use of Polygraphs and Similar Devices by Federal Agencies, H.R. Rep.No.795, 94th Cong., 2d Sess. 46 (1976)." [116 Ariz. at ___, 568 P.2d at 1067]

*McDavitt*, 62 N.J. 36, 297 A.2d 849 (1972), where the New Jersey Supreme Court stated the polygraph test evidentiary role as follows:

> "Where polygraph test results are admitted into evidence, the jury should be instructed as to the consideration to be given such testimony. It is not direct proof of a defendant's guilt or innocence of the crime charged. It is opinion evidence by an expert and tends only to indicate whether or not the subject was telling the truth when tested. . . ." [62 N.J. at 47, 297 A.2d 855]

The court in *State v. Chambers*, 240 Ga. 76, 239 S.E.2d 324 (1977), after adopting the *Valdez* stipulation theory, not only approved the use of polygraph tests in the state's case-in-chief, but also held the test had corroborated evidentiary value, at least to the extent to uphold a rape conviction under the rule that the victim's accusation must have some independent corroboration. This despite its language that:

> "In giving the charge the judge should state that the examiner's opinions may only be used to indicate whether at the time of the polygraph examination the person examined believed that he was telling the whole truth. . . ." [240 Ga. at 80, 239 S.E.2d at 327]

It is difficult to perceive how the written stipulation or the fact that the polygraph test can be admitted to impeach the credibility of the defendant can furnish any sound legal theory for the use of the polygraph in the state's case-in-chief. An even more difficult problem is encountered if we attempt to utilize these theories when the defendant seeks to admit a favorable polygraph test taken under a *Valdez* stipulation. If we follow the *Valdez* rationale that the polygraph test is not independent proof of any fact but merely bears on credibility, the defendant ordinarily cannot introduce his own extrajudicial exculpatory statements. They are generally thought to be too self-serving. *Piassick v. United States*, 253 F.2d 658, 661 (5th Cir. 1958); *Commonwealth v. Fatalo*, 345 Mass. 85, 185 N.E.2d 754 (1962); McCormick

*Handbook of the Law of Evidence* § 145, at 312 n. 21 (2nd ed. 1972). We have not encountered a case which discusses this point. Obviously, the defendant gains little from a *Valdez* stipulation if he cannot introduce a favorable polygraph test.

Massachusetts, perhaps sensing the weakness of *Valdez*, has moved a step beyond in *Commonwealth v. A Juvenile*, 365 Mass. 421, 313 N.E.2d 120 (1974), by holding that a defendant may move the trial court directly for the right to take a polygraph test. If the motion is granted, the test is admissible, although both the state and the defendant can cross-examine the expert. The basis for admitting it into evidence is not specifically articulated, although the court's view of the accuracy of the polygraph is somewhat restrained:

> "In sum, despite very significant progress in recent years, the field of polygraphy is still challenged forcefully on theoretical grounds and has yet to achieve a predictable level of consistency among examiners. For these reasons we do not believe that at this time polygraph test results should be generally admissible in evidence in criminal trials." [365 Mass. at 429, 313 N.E.2d at 125]

Curiously, it might be thought that once the *Valdez* written stipulation theory was abandoned, the door would be opened to permit the polygraph test to be accepted on its own merits. In the subsequent case of *Comonwealth v. Stewart*, 377 N.E.2d 693, 697 (Mass. 1978), the Supreme Judicial Court concluded that a defendant could not first take a polygraph test and then move its admission. Following what might be termed a Russian roulette theory of admissibility of polygraph tests, the court held that the defendant must elect to agree in advance that the test would be admitted irrespective of the test results.

While the proponents of the admissibility of the polygraph test assume its substantial accuracy, there is still confusion as to the exact function it plays. Some, analo-

gizing it to other scientific tests, such as ballistic tests, blood samples and other chemical tests, urge its admissibility as a scientific test, but state it is not proof of any independent fact.[8]

There can be little question that from a jury standpoint, the polygraph test as interpreted by the expert is independent proof of what often are the most critical facts in the case, that is, the guilt of the defendant. It must be kept in mind that the general interrogation approach on a polygraph examination is to ask the defendant a series of questions to which only "yes" or "no" responses are given.[9] Among the questions asked are those dealing directly with the crime involved: "Did you murder Ralph Steinman?"; "Did you strike Ralph Steinman on the head with a blunt object?";[10] "Did you intentionally cut Markle?"; "Did you intentionally swing a knife at Josephine Wait?"[11] In this case, two of the questions were, "Did you give Kenneth Morgan a cigarette of

---

[8] B. Tarlow, in *Admissibility of Polygraph Evidence in 1975: An Aid in Determining Credibility In a Perjury-Plagued System*, 26 Hastings L.J. 917, 935 (1975), states:

"Of course, the expert is testifying as to the truth of the subject's stated beliefs; *i.e.*, as to whether the subject *believed* that his answers were true, rather than as to the actual empirical veracity of those answers...." [Emphasis in original]

McCormick, *Evidence* § 207 (2nd ed. 1972), under the general heading "Experimental and Scientific Evidence," discusses the polygraph, but does not advance a formal theory for its admissibility except to state:

"Clearly, nothing in the entire technique can show the underlying empirical truth in the sense of the facts occurring in the past; but only whether the person examined himself believed his answers." [p. 505]

"As suggested in a previous section, the explanation can scarcely be found in any serious contention that even the opinion of a qualified expert in the field throws no light on the question of whether relevant statements made by a party or witness were sincere or not...." [p. 507]

[9] *See generally* J. Reid & F. Inbau, *Truth and Deception: The Polygraph ("Lie Detector") Technique* (1966), at 16, *et seq.*

[10] From the opinion in *State v. Souel,* 53 Ohio St. 2d 123, 7 Ohio Ops. 3d 207, 372 N.E.2d 1318, 1320 (1978).

[11] From *State v. Ross,* 7 Wash. App. 62, 497 P.2d 1343, 1346, 53 A.L.R. 3d 997, 1001 (1972).

marijuana?" and "Did the cigarette you gave Kenneth Morgan contain marijuana?"

Obviously, when the jury hears testimony from the polygraph expert that the polygraph test showed the defendant lied when he responded "No" to the question, "Did you murder Ralph Steinman?", the jury's conclusion will be that his *true* answer was "Yes."

This result inexorably follows from the basic theory of the polygraph that it measures the physiological responses of the subject which cannot be masked when he lies. It is this spontaneous physiological response as interpreted by the expert which forms an independent fact of a scientific nature.

Thus, to close the illustration, the independent scientific fact proved by the polygraph test is not merely that the defendant lied when he answered "No" to the question, "Did you murder Ralph Steinman?", but that the true answer is "Yes," as established by his physiological reaction.[12]

We cannot view the test from any other standpoint and none of the reasons advanced for its limited admissibility square with the underlying function of the test. We are persuaded that despite the assertions of the scientific nature of the test, much depends on the subjective analysis of the test results by its operator. We know of no scientific test conventionally admitted by the courts which carries such a high degree of interpretative subjectivity.

The insanity defense is peripherally analogous, but no machine is represented as testing scientifically the presence of insanity. The issue of insanity is ultimately a jury question, based usually on the conflicting testimony of experts. Here, the polygraph machine resolves the issue, unless we recognize that its results are subject to

---

[12] This result occurs by virtue of the dichotomous nature of the questions, which are designed to be answered either "yes" or "no." However, this may be undercut by the operator's evaluation technique. *See* note 5(c) *supra*.

differing interpretations by polygraph experts, which is a frank admission of the fallibility of the experts' interpretation. Additionally, it might be recognized that multiple polygraph tests on the same subject can produce opposite results. This, of course, would cast doubt upon the accuracy of the machine, as well as that of the operator.[13]

Undoubtedly, the issue of admissibility of polygraph tests could be resolved (much like the insanity issue) by recognizing the independent testimonial quality of the test as interpreted by the expert, and by permitting each side to offer its own test results, no matter how divergent from the other party's, leaving the entire resolution to the good judgment of the jury. However, the advocates of admissibility are strangely silent on recommending this approach, possibly because this would be a tacit admission that the test is not really scientific.

In the final analysis, we do not accept the current legal theories under which courts have permitted the limited introduction of polygraph tests. There is the silent premise that these courts do not really believe the polygraph to be a scientifically accurate test such that it can be admitted as can other scientific tests. Consequently, admissibility is restricted on rather artificial grounds.

---

[13] The possibility that opposite polygraph test interpretations or opposite test results can occur with the same subject is demonstrated by the facts in the following cases, but in each instance the court did not discuss the legal ramifications of this possibility as bearing on the accuracy of the test or the operator's interpretation. In *State v. Baskerville*, 139 N.J. Super. 389, 354 A.2d 328 (1976), the defendant sought to have his own polygraph expert give testimony which was contrary to the interpretation of the test result reached by the state's expert. The court permitted this. In *State v. Seebold*, 111 Ariz. 423, 424-25, 531 P.2d 1130, 1131-32 (1975), the defendant sought to have admitted a polygraph test taken privately before he had stipulated to another test by the state, which was unfavorable. The court rejected the defendant's test, since it had not been undertaken pursuant to a prior written stipulation with the state's attorney.

We do acknowledge that the basic concept of a polygraph test rests on the principle that it measures a person's physiological reactions. We do not, however, readily accept the further premise that the polygraph expert plays a neutral role in the interpretation of the test results.

Nor do we find any court or commentator who acknowledges the reality that the polygraph is designed to establish by independent measurement the physiological response of the subject which, when interpreted by the operator on critical questions involving the commission of the crime, forms a separate testimonial basis of the facts relating to the crime.

Perhaps the reason such reality is not openly acknowledged is that the polygraph test would have to be admitted. But if such tests are to be openly admitted on the foregoing basis, then each side must be free to develop and seek admission of contrary polygraph tests. The trial courts would then be subject to a plethora of collateral questions, which can only result in multiplying the possibility of reversible error.[14] Moreover, the only vir-

---

[14] Most jurisdictions follow a rather liberal standard relative to the qualifications of experts, stating that all that is required is some specialized knowledge above that of the average juror. *Moore, Kelly & Reddish, Inc. v. Shannondale, Inc.*, 152 W. Va. 549, 566, 165 S.E.2d 113, 123-24 (1968); 31 Am. Jur. 2d *Expert and Opinion Evidence* § 26; 32 C.J.S. *Evidence* § 457; 7 J. Wigmore, *Evidence* § 1923 (3rd ed. 1940 and 1977 Pocket Supp.). This provides little safeguard for screening polygraph experts.

Obviously, a defendant would enjoy a greater advantage if the test could be openly admitted, since he could shop for tests among experts until he obtained a favorable result. If the prosecutor sought to require him to submit to a test, he might claim his privilege against self-incrimination because of the testimonial nature of the test. *Commonwealth v. A Juvenile*, 365 Mass. 421, 313 N.E.2d 120 (1974), has recognized that *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S.Ct. 1602 (1966), may apply to the defendant's taking a polygraph test. This is implied in *Schmerber v. California*, 384 U.S. 757, 16 L. Ed. 2d 908, 86 S.Ct. 1826 (1966):

"To compel a person to submit to testing in which an effort will be made to determine his guilt or innocence on the basis of physiological responses, whether willed or not, is to evoke the spirit and

tue of the polygraph test, that it produces the same scientifically accurate result each time it is administered notwithstanding different operators or machines, would be destroyed.

Since we refuse to accept the artificial theory of admitting a polygraph on the basis of an agreed stipulation and on the basis the results relate only to credibility, and reject for the reasons stated the admission of the polygraph as a scientific test, we must conclude that the polygraph is not admissible in this State.

## III

## SUFFICIENCY OF PROOF THAT SUBSTANCE WAS MARIJUANA

The defendant urges that the evidence against him is totally insufficient to warrant a conviction, since there was no competent proof that a substance delivered was marijuana. Consequently, the trial court should have granted his motion for acquittal or judgment notwithstanding the verdict.

The State's case against Frazier consisted of two items of evidence: (1) the testimony of Morgan that Frazier gave him marijuana cigarettes, and (2) the testimony of the State Police polygraph operator who stated that Frazier lied in response to the question whether he had given Morgan marijuana cigarettes. We have held the polygraph testimony to be inadmissible.

Morgan, a high school student, testified that his past experience in smoking marijuana enabled him to identify the cigarettes the defendant gave him as containing

---

history of the Fifth Amendment." [384 U.S. at 764, 16 L. Ed. 2d at 916, 86 S.Ct. at 1832]

If there is a separate scientific basis for the test, would it not be available for any witness whose testimony may be contradicted on critical fact issues? Moreover, would not the state be required to produce, as exculpatory material under *Brady v. Maryland,* 373 U.S. 83, 10 L. Ed. 2d 215, 83 S.Ct. 1194 (1963), adverse tests made on its witnesses? Obviously, this entire area would provide an inexhaustible vein of possible error for imaginative defense counsel.

marijuana, on the basis of their effect on him. In response to the prosecutor's inquiry, "I take it you did not run a chemical test on it," Morgan said, "No sir."

The defendant stated, on the other hand, that the cigarettes he gave Morgan contained not marijuana but parsley. He disclosed that he rolled parsley from a parsley spice bottle into cigarettes for the purpose of deceiving Morgan into thinking they were marijuana cigarettes. Believing that Morgan intended to try marijuana and believing parsley would make him sick, Frazier said he intended for Morgan to smoke these cigarettes, become ill, and thus refrain from smoking marijuana.

Because no chemical test of any kind was conducted, we must decide whether the lay opinion of the prosecuting witness was alone sufficient to prove that the substance making up the cigarettes was marijuana. We do not find any authority directly in point in our jurisdiction. *State v. Knight*, _____ W. Va. _____, 230 S.E.2d 732, 737 (1976), deals with the sufficiency of expert testimony in identifying marijuana, but cites no authorities.

From other jurisdictions, it would appear that the general rule is that a person who possesses no special expertise is not qualified to give an opinion that the substance in question is a prohibited substance. *See, e.g., People v. McLean*, 56 Cal. 2d 660, 662-64, 16 Cal. Rptr. 347, 348-49, 365 P.2d 403-405 (1961), *cert. denied*, 370 U.S. 958, 8 L. Ed. 2d 824, 82 S.Ct. 1613 (1962); *Scopolites v. State*, 50 Ala. App. 115, 117, 277 So.2d 389, 391 (1973), *cert. denied (Ala.)*, 291 Ala. 797, 277 So.2d 395; *Slettvet v. State*, 258 Ind. 312, 280 N.E.2d 806 (1972); *People v. Kenny*, 30 N.Y.2d 154, 282 N.E.2d 295 (1972); *State v. Maupin*, 42 Ohio St. 2d 473, 71 Ohio Ops. 2d 485, 330 N.E.2d 708, 712-13 (1975); *State v. Emmett*, 77 Wash. 2d 520, 463 P.2d 609 (1970); Annot., 75 A.L.R. 3d 717 (1977).

In *People v. McLean, supra,* under a situation somewhat analogous to the present case, the state's only witness was a sixteen-year-old girl, who testified she had smoked what she thought was marijuana on other occasions and that the substance given her by the de-

fendant caused the same reaction. In rejecting her testimony, the court stated:

> "The objections should have been sustained to the questions asked Miss Ellis as to what she smoked, for the reason that she was not qualified to give expert testimony. Miss Ellis was inexperienced with narcotics. Her only contact with drugs was the smoking on 'about' seven occasions of cigarettes which she thought contained marijuana. There was no evidence that what she smoked on the five occasions subsequent to those involved in this case was in fact marijuana. There was no proper foundation supporting her testimony as to the fact that defendant had furnished her marijuana." [56 Cal. 2d at 663, 16 Cal. Rptr. at 349, 365 P.2d at 405]

Here, the witness Morgan was not asked if he had any detailed knowledge of the physical appearance of marijuana or if he had examined the substance that was allegedly in the cigarette to see if it resembled marijuana. His testimony was that he smoked it and, in his opinion, it was marijuana. There was a complete absence of any objective factors or any special familiarity with the substance that would give any accuracy to his testimony. As a matter of law, Morgan's testimony, that the substance delivered to him and which he smoked was marijuana, is inadmissible, and it was error for the trial court to admit the testimony.

## IV

## THE DOUBLE JEOPARDY QUESTION

The final question involves whether, under the evidence, a new trial is mandated, or whether, under the double jeopardy holding in *Burks v. United States*, ____ U.S. ____, 57 L. Ed. 2d 1, 98 S.Ct. 2141 (1978), and *Greene v. Massey*, ____ U.S. ____, 57 L. Ed. 2d 15, 98 S.Ct. 2151 (1978), a judgment of acquittal must be entered. In *Burks*, a unanimous Supreme Court declared:

> "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it

failed to muster in the first proceeding. This is central to the objective of the prohibition against successive trials. The Clause does not allow 'the State ... to make repeated attempts to convict an individual for an alleged offense,' since 'The constitutional prohibition against "double jeopardy" was designed to protect an individual from being subjected to the hazards of trial and possible conviction more than once for an alleged offense.' *Green v. United States*, 355 U.S. 184, 187, 2 L. Ed. 2d 199, 78 S.Ct. 221, 77 Ohio L. Abs. 202, 61 A.L.R.2d 1119 (1957); see *Serfass v. United States*, 420 U.S. 377, 387-388, 43 L. Ed. 2d 265, 95 S.Ct. 1055 (1975); *United States v. Jorn*, 400 U.S. 470, 479, 27 L. Ed. 2d 543, 91 S.Ct. 547 (1971)." [\_\_\_ U.S. \_\_\_, 57 L. Ed. 2d at 9-10, 98 S.Ct. at 2147]

However, the Court did carefully distinguish between reversal on the ground of evidentiary insufficiency and reversal on the ground of trial error:

"In short, reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case. As such, it implies nothing with respect to the guilt or innocence of the defendant. Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, *e.g.*, incorrect receipt or rejection of evidence, incorrect instructions, or prosecutorial misconduct...." [\_\_\_ U.S. at \_\_\_, 57 L. Ed. 2d at 12, 98 S.Ct. at 2149]

In regard to the standard of review for evidentiary insufficiency, it acknowledged an existing standard not substantially different from that stated in Syllabus Point 1 of *State v. Starkey*, \_\_\_ W. Va. \_\_\_, 244 S.E.2d 219 (1978):[15]

---

[15] "In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interfer-

> "The prevailing rule has long been that a district judge is to submit a case to the jury if the evidence and inferences therefrom most favorable to the prosecution would warrant the jury finding the defendant guilty beyond a reasonable doubt. [Citations omitted] Obviously a federal appellate court applies no higher a standard, rather it must sustain the verdict if there is substantial evidence, viewed in the light most favorable to the Government, to uphold the jury's decision. ..." [___ U.S. ___, 57 L. Ed. 2d at 13, 98 S.Ct. at 2150]

Factually, *Burks* involved the claim that on the affirmative defense of insanity, the prosecution failed to prove the defendant sane beyond a reasonable doubt. As a matter of law, the Circuit Court of Appeals found this to be true based on its review of the record. The Supreme Court agreed, and concluded double jeopardy dictated a judgment of acquittal.

In *Greene*, a first degree murder conviction in a Florida trial was attacked on double jeopardy through a federal habeas corpus. After his initial conviction of first degree murder without recommendation of mercy, the defendant appealed to the Florida Supreme Court, which reversed in a per curiam opinion. The basis for the reversal was obscure, although there was some suggestion that the evidence was insufficient to establish a conviction of first degree murder. In any event, over the defendant's double jeopardy objection, a second trial ensued. The jury returned another first degree murder verdict, but with a recommendation of mercy.

The United States Supreme Court found that jeopardy could attach. It acknowledged that *Benton v. Maryland*, 395 U.S. 784, 23 L. Ed. 2d 707, 89 S.Ct. 2056 (1969), had settled that the Double Jeopardy Clause of the Federal

---

ence with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done."

Constitution is binding on the states,[16] and therefore required the application of the *Burks* principle to the Florida conviction. It concluded that because of the ambiguity of the Florida per curiam opinion, the case would be remanded to the Fifth Circuit Court of Appeals to determine whether the Supreme Court of Florida had found from the record of the first trial that the evidence was insufficient.

There is no question that *Greene* avoided determining what the outcome would be if the evidence was sufficient to support a verdict of a lesser included offense:

> "Given our decision today to remand this case for reconsideration by the Court of Appeals, we need not reach the question of whether the State could, consistent with the Double Jeopardy Clause, try Greene for a lesser-included offense in the event that his first-degree murder conviction is voided." [____ U.S. at ____, 57 L. Ed. 2d at 21 n. 7, 98 S.Ct. at 2155]

Both *Burks* and *Greene* do not precisely answer the problem before us. Here, the evidentiary insufficiency arises as a result of our having determined on appeal that the polygraph test and the testimony of Morgan are not admissible. It is these rulings that create the evidentiary insufficiency since our rulings carve out of the State's case the only evidence which proves that the substance was marijuana. Such proof is an essential element of the crime.

Neither *Burks* nor *Greene* involved the situation where the appellate court had determined that certain evidence was inadmissible and thereby created the state of evidentiary insufficiency. Both of these cases dealt

---

[16] In *Conner v. Griffith*, ____ W. Va. ____, 238 S.E.2d 529 (1977), we recognized that the scope of the Double Jeopardy Clause in the Fifth Amendment of the Federal Constitution, as outlined in *North Carolina v. Pearce*, 395 U.S. 711, 23 L. Ed. 2d 656, 89 S.Ct. 2072 (1969), was at least coextensive with that of the Double Jeopardy Clause contained in Article III, Section 5 of the West Virginia Constitution.

with claims that all the evidence submitted to the jury was insufficient to support a conviction.

In *Burks*, the Court stated that "trial error" would not trigger double jeopardy, but that "evidentiary insufficiency" would. It then went on to explain the concept of trial error:

"Rather, it is a determination that a defendant has been convicted through a judicial process which is defective in some fundamental respect, e.g., *incorrect receipt or rejection of evidence*, incorrect instructions, or prosecutorial misconduct." [___ U.S. at ___, 57 L. Ed. 2d at 12, 98 S.Ct. at 2149] [Emphasis supplied]

Obviously, if the "incorrect receipt ... of evidence" constitutes *trial error* which does not invoke double jeopardy, there will be those occasions, such as here, where, after excising the bad evidence, what is left is insufficient to establish a sufficient case to submit to the jury. Yet, it seems apparent that *Burks* did not intend to overlap the two categories of "trial error" and "evidentiary insufficiency," even though both dealt with evidentiary problems.

We believe that *Burks'* teaching is that where on appeal the entire record as given to the jury was insufficient to support the conviction, then there is an "evidentiary insufficiency," and the defendant is entitled to the double jeopardy bar. Where, however, the appellate court finds reversible evidentiary error, then this is trial error and the case is reversed and no jeopardy attaches. In other words, the appellate court cannot, after excluding evidence on appeal, take the remaining evidence and see if it is sufficient to uphold the verdict.

The cornerstone of the double jeopardy bar as determined by *Burks* was that the State cannot complain when upon all of the evidence "*submitted* to the jury" an appellate court concludes that such evidence was insufficient to warrant a jury conviction. [___ U.S. at ___, 57 L. Ed. 2d at 13, 98 S.Ct. at 2150] [Emphasis in original] This is amplified in the central statement on double jeopardy announced in *Burks* and which we adopt under

our Double Jeopardy Clause in Article III, Section 5 of our Constitution:

> "The Double Jeopardy Clause forbids a second trial for the purpose of affording the prosecution another opportunity to supply evidence which it failed to muster in the first proceeding." [___ U.S. at ___, 57 L. Ed. 2d at 9, 98 S.Ct. at 2147]

Again we note the emphasis on the initial failure of the prosecutor to muster evidence in the first proceeding. Clearly, the focus is on the evidence introduced at the trial and not on what is left after the appellate court completes its review. Thus, we conclude that in order to determine if there is evidentiary insufficiency that will bar a retrial under double jeopardy principles, such determination is made upon the entire record submitted to the jury and not upon the residual evidence remaining after the appellate court reviews the record for evidentiary error.[17]

The present case aptly illustrates the unfairness that can result if the "evidentiary insufficiency" test is applied by the appellate court after it has ruled inadmissible critical areas of the State's evidence. Here, there were evidentiary points that involved matters of first impression in this State. A reasonable prosecutor might well have concluded that the polygraph test would be admitted through the *Valdez* line of cases or that the witness Morgan's testimony was admissible. When the

---

[17] Of some interest is the fact that *Burks* cites and partially follows the theory contained in Note, *Double Jeopardy: A New Trial After Appellate Reversal for Insufficient Evidence*, 31 U. Chi. L. Rev. 365, 371-72 (1964) [57 L. Ed. 2d at 12, 98 S.Ct. at 2149], where the following statement is made:

"The trial court may have erroneously excluded prosecution evidence which would have been sufficient to support the conviction. Or the appellate court may find that after erroneously admitted evidence is struck from the record there is insufficient evidence remaining to support the conviction. In both cases the considerations which permit a new trial after reversal for error should control over the considerations which should prohibit a new trial after reversal for insufficient evidence...."

new evidentiary rule is set adversely to his position on appeal, he should not be foreclosed from developing on a new trial alternate sources of proof.

Perhaps implicit in this rule is the recognition that often in a criminal trial there are close legal issues which must be resolved. Such resolutions may occur without the opportunity for studied research and reflection. In consequence, the State should not be foreclosed from a chance to correct these trial errors, which have been found to be reversible by an appellate court exercising the advantage of extensive research and reflection.

The Fourth Circuit Court of Appeals has recently confronted this same question in *United States v. Mandel,* No. 77-2487 (4th Cir. Jan. 11, 1979). It determined that part of the government's evidence was not admissible, but declined to rule on the insufficiency of the remaining portion of the government's case under *Burks,* since there was other trial error found besides the inadmissible evidence, and advanced this as one of the reasons:

> "Another reason for not requiring an appellate court to adjudge the sufficiency of the balance of the evidence, when a part of the evidence has been improperly admitted, is that it is impossible to say what other evidence the government might have produced had the faulty evidence not been admitted, and what theory of the case the government might have principally pursued had it been presented in the context of different evidence before the jury." [Slip op. at 85]

We conclude under *Burks* that in determining whether there exists "evidentiary insufficiency" on appeal that invokes the principles of double jeopardy, the appellate court must view the evidence as submitted to the jury and not what remains in the record after the appellate court rules out inadmissible evidence.

Under the double jeopardy principles set out in *Burks* and *Greene,* which we incorporate into our own Double

Jeopardy Clause in Article III, Section 5 of the West Virginia Constitution, the defendant is not entitled to a judgment of acquittal. Therefore, this case is reversed and remanded for further proceedings not inconsistent with this opinion.

*Reversed and remanded.*