STATE OF WEST VIRGINIA

*v.*

RONALD J. ANDRIOTTO

(No. 14330)

Decided July 13, 1981.

*Sterl F. Shinaberry, Hostler & Shinaberry* for plaintiff in error.

*Chauncey H. Browning,* Attorney General, *S. Clark Woodroe,* Assistant Attorney General, for defendant in error.

NEELY, JUSTICE:

This is an appeal from a conviction of being an accessory before the fact to kidnapping in the Circuit Court of Monongalia County. While there are a few technical errors which we will need to address, this case was very competently tried in the circuit court and the primary question is whether there is sufficient evidence to convict the appellant, Ronald J. Andriotto. While the primary witness for the State of West Virginia was himself a convicted felon, an indicted co-conspirator, and generally a person of bad character, nonetheless, upon a thorough

reading of the entire transcript the Court is convinced that there is sufficient, persuasive, corroborating circumstantial evidence to justify a jury verdict of guilty. Consequently, we affirm.

On 1 July 1976, Martin Piribek, Executive Vice-President of the First National Bank of Morgantown, left for work at approximately 9:00 o'clock. His wife, Rachael, went down to the laundry, did some work, and then went up to the bedroom. Shortly after 9:00 o'clock the doorbell rang and when Mrs. Piribek answered the door she found a man standing on the porch who said he was an insurance investigator and needed to come in to get some information. Mrs. Piribek asked for identification but at the same time released the door latch. The man immediately forced the door open, clamped his hand over Mrs. Piribek's face, and another man stepped forward and followed him through the door.

The men pushed Mrs. Piribek to the floor and informed her that if she failed to remain silent they would blow her brains out. They took Mrs. Piribek back to the bedroom at gunpoint and made a telephone call to Mr. Piribek's bank. The substance of the telephone call was that Mr. Piribek should take the sum of $300,000 to a telephone booth located at a specific place in an area in Morgantown known as the "mileground" and that if he failed to follow their directions, they would kill Mrs. Piribek. One of the men then ripped all of the telephones out of the wall, handcuffed Mrs. Piribek's hands behind her back, and then linked a second set of handcuffs through the first set and attached the second set to her ankles. The men then departed the Piribek residence leaving Mrs. Piribek on a bed in the bedroom. Hours later the police released Mrs. Piribek and the ransom was never paid.

The police had known that some effort to rob a Morgantown bank was being planned for at least two weeks. An inmate of the Kennedy Youth Center (a federal correction facility) named Gary Fields had informed Unit Manager Alex Komons, who informed West Virginia authorities that a bank robbery was being planned. Almost immediately after the crime occurred, West Virginia State

Police officers knew that James Wallace Smith, 23, a former Kennedy Center inmate then in the Atlanta area, knew about the kidnapping. The State Police immediately dispatched one of its troopers to Atlanta where Smith was interrogated by federal, Georgia, and West Virginia law enforcement officials.

Smith said that he had met the appellant 3 June 1976 when he started to work at Andriotto's car wash, the Jet Car Wash located in Morgantown. According to Smith, Andriotto took a liking to Smith and began to confide in him. Andriotto related that he was in a difficult financial position, that his business was going downhill, and that he was in trouble with the Internal Revenue Service over his taxes. Smith told the police at his interrogation in Atlanta that Andriotto had conceived the scheme of kidnapping Mrs. Piribek and that he had requested that Smith participate in the crime with him and two other associates. Furthermore, Smith related to the police an elaborate story, including names and places which if true, would conclusively demonstrate that Andriotto was the instigator, procurer, and chief executive officer of the kidnapping enterprise.

In order to corroborate Smith's story, the Georgia Bureau of Investigation requested that Smith telephone Andriotto on the official Georgia police telephone and attempt to elicit incriminating statements from him. Smith agreed to cooperate, the telephone conversation occurred, and the Georgia police recorded the entire conversation on tape. This tape was later introduced at trial and played for the benefit of the jury. While Andriotto did not actually admit his involvement in the crime on the tape, it is obvious that Andriotto had had a relationship with Smith well above and beyond the normal relationship that would exist between an employer and a low-wage, itinerant, work-release laborer. The evidence at trial indicated that Smith could not possibly have worked more than twelve working days for Andriotto, and the tape demonstrates that Andriotto was seriously concerned about Smith's testifying against him.

Andriotto's reaction to Smith's suggestion on the tape that Smith might be compelled to implicate Andriotto if the police put pressure on him is not the reaction of an innocent man. The impression which one gets from reading a transcript of the tape is that Andriotto was torn between two conflicting concerns: first, he was obviously aware of the possibility that the conversation was being taped since the police had already questioned him about the crime; second, he felt an urgent need to communicate to Smith his conclusion that if Smith would keep quiet there would be no trouble from the authorities. Most importantly, Andriotto's statements and assurances to Smith were not those of an innocent man to a blackmailer, though Andriotto later claimed Smith had tried to blackmail him.

At trial the State's star witness was James Smith who was given immunity from prosecution for his testimony. He testified that Andriotto planned the crime, and solicited the help of a man known as "Big John" Galayda who lived across the West Virginia border in Pennsylvania. According to Smith, Andriotto and Galayda met on a number of occasions and on one occasion Andriotto, Galayda, Smith, and two of Galayda's associates, one Roger Brooks and one Carl Salvcci went to Andriotto's apartment for the purpose of planning the crime. The State introduced evidence that around the time of the crime Andriotto placed sixteen long distance, paid telephone calls to Galayda's residence; however, Andriotto explained those calls by alleging that he was trying to sell his car wash to Galayda. The men who actually perpetrated the kidnapping were never prosecuted and Galayda was not called as a witness at trial. Furthermore, Mrs. Piribek was unable to give a sufficiently detailed description of the two men who kidnapped her for the jury to determine whether one of the men matched Smith's description of John Galayda. Consequently, there was no persuasive corroboration of Smith's story in this regard, but at the same time Mrs. Piribek's sketchy description was so obviously unreliable that to the extent that it did not match Galayda's description the lack of similarities in description did not exclude Galayda as a perpetrator.

Finally, Smith testified in elaborate detail concerning the layout of the apartment to which he, Andriotto, Galayda, and a forth man retired to plan the crime. Andriotto testified that he did not rent such an apartment; that he had rented only one apartment since 1975; and, that he had never been in such an apartment as Smith described to plan the crime or for any other reason. The jury was taken for a view of Andriotto's apartment and there was absolutely no similarity between that apartment and the apartment which Smith described. Unfortunately for Andriotto's credibility, however, the State on rebuttal produced conclusive evidence that Andriotto had rented two other apartments within the last few years under assumed names. While none of these apartments fitted the description of the apartment about which Smith testified, Andriotto had been caught in an outright lie about a material matter and his credibility was reduced as a result. The jury obviously inferred that Andriotto either rented or had access to an apartment such as Smith described but that the police had been unable to locate it because it was either rented by another person or was rented by Andriotto under an assumed name.

## I

Though appellant argues that he was convicted upon insufficient evidence, we disagree. If we sum up the elements which make the evidence sufficient to sustain a conviction we must begin with the firsthand, eyewitness testimony of Smith who said that he was actually present and participating at the time that Andriotto instigated and procured the commission of the crime. While Smith is admittedly of low character and for that reason an unreliable witness, his testimony is corroborated in five important ways. First, his taped telephone conversation with Andriotto is entirely consistent with Andriotto's having been previously involved with Smith in the planning of this crime. Second, the evidence indicates that Smith and Andriotto communicated by telephone through calls placed by Smith from Atlanta and paid for by Andriotto after Smith left Morgantown on 23 June 1976 for Atlanta but before the police focused in on Smith as an

accomplice or suspect. This indicates far more than a simple employer-employee relationship between Smith and Andriotto. Third, the police were aware that some crime involving a bank in Morgantown was being planned approximately two weeks before the crime was committed and the source of this information was the Kennedy Youth Center where Smith was incarcerated. Fourth, Andriotto communicated by telephone with John Galayda on sixteen separate occasions right around the time the crime was committed. Fifth and finally, Andriotto lied under oath with regard to the terms and conditions on which he rented apartments in the City of Morgantown when he was well aware that the existence or non-existence of a particular apartment was a material element in the corroboration of Smith's story.

Thus, upon all of the evidence presented to them, we conclude that the jury were entitled to determine that Andriotto was guilty as charged in the indictment. The evidence in this case meets our standards for sufficiency. The corroboration of Smith's story, much of it from appellant's own mouth, is so overwhelming in this case and the explanations of the appellant, who voluntarily took the stand in his own defense, are so unpersuasive that the jury were entitled to conclude that the appellant was guilty. In addition, the circumstantial evidence is important *only* as it corroborates Smith's firsthand account of what transpired. While it is essential in this case to scrutinize the circumstantial evidence because of the low character of the State's primary witness, we are not dealing with a case where a conviction has been procured on circumstantial evidence alone. As we have held in syl. pt. 1, *State v Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978):

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the

evidence was manifestly inadequate and that consequent injustice has been done.

## II

There are a number of technical errors which, while unmeritorious, should receive at least summary attention. The appellant maintains that the facts do not demonstrate that he was an accessory before the fact to the crime of kidnapping as set forth in *W. Va. Code*, 61-2-14(a) [1965]. Obviously Mrs. Piribek was "confined" within the meaning of that *Code* section "for the purpose or with the intent of taking, receiving, demanding or extorting ... money." Furthermore, according to Smith's corroborated testimony Andriotto was the person who, while not actually present at the commission of the crime, counseled, procured, planned, and abetted in the preparation of it. *State ex rel. Brown v. Thompson*, 149 W.Va. 649, 142 S.E.2d 711, 720 (1965).

The appellant asserts that the taped conversation between Smith and appellant should not have been introduced into evidence because it was elicited by the prosecuting authorities, through their agent, Smith, after the prosecuting authorities had begun to focus upon the appellant's guilt. Appellant asserts that since Smith was an agent of the prosecuting authorities, *Miranda* warnings should have been given. This is obviously absurd since the obligation of the police to warn a suspect of both his right to counsel and his right against self-incrimination applies only to custodial or other settings where there is a possibility of coercion. *See Beckwith v. United States*, 425 U.S. 341 (1976). In the instance of Andriotto's telephone conversation there was no possible element of police coercion; the entire conversation emanated from a ruse, the success of which depended upon the appellant's believing that no police were within earshot. This sort of investigating tactic has been repeatedly upheld by the United States Supreme Court. *E.g.*, *United States v. White*, 401 U.S. 745 (1971); *Lopez v. United States*, 373 U.S. 427 (1963); and on *Lee v. United States*, 343 U.S. 747 (1952).

The appellant maintains that the circuit court abused its discretion when it failed to grant a continuance longer than

one week after the State provided a new list of twenty-five additional witnesses whom they indicated they might call. Since the appellant does not allege that any of these witnesses was actually called or that he suffered any actual prejudice as a result of inadequate opportunity to prepare to meet their testimony, we find this assignment without merit. *See Wilhelm v. Whyte,* 161 W.Va. 67, 239 S.E.2d 735, 739 (1977).

The appellant alleges that his right to remain silent was violated when the State asked him in cross-examination why he had initially failed to cooperate with the police. The appellant took the stand as a witness in his own defense and thus voluntarily undertook to subject himself to cross-examination. The prosecutor did not indicate at any point that the appellant had stood upon his right to remain silent; rather, the prosecution was drawing attention to the fact that Andriotto's conduct during the investigation of the crime was not consistent with the actions of a man who was being blackmailed or extorted by a perjurer, namely Smith.

Finally appellant asserts that the court committed error in refusing to grant him a new trial based upon after discovered evidence. Upon conviction the appellant was confined in the Monongalia County jail and it appears that later two witnesses came forward who were willing to testify that Smith had confided to them that he was involved in a scheme to extort money from the appellant by threatening to testify falsely against him. We find that the circumstances under which these witnesses came to light do not cause them to be particularly credible, and the question of Smith's motives for perjury as well as his low character were adequately explored at trial. Appellant produced at trial three officials of the Kennedy Youth Center who testified concerning Smith's low character and all testified that they would not believe Smith under oath. The test for whether newly discovered evidence as to the credibility of a witness merits a new trial was set out by this Court in syl. pt. 2, *State v. Stewart,* 161 W. Va. 127, 239 S.E.2d 777 (1977).

A new trial on the basis of newly-discovered evidence will generally be refused when the sole object of the new evidence is to discredit or impeach a witness on the opposite side. However, when the newly-discovered impeachment evidence comes within the following rules, a new trial will be granted: (1) The evidence must appear to have been discovered since the trial, and, from the affidavit of the new witness, what such evidence will be, or its absence satisfactorily explained. (2) The facts must appear in his affidavit that the party was diligent in ascertaining and securing his evidence, and that the new evidence is such that due diligence would not have secured it before the verdict. (3) The evidence must be new and material, and not merely cumulative. (4) The evidence must be such as ought to produce an opposite result at a second trial on the merits.

The alleged newly-discovered evidence was at most cumulative and would not have changed the outcome at a second trial. Hence the evidence does not meet two of the four criteria set out in *Stewart*. Therefore, we cannot say that the circuit court abused its discretion in denying a new trial.

Accordingly, for the reasons set forth above the judgment of the Circuit Court of Monongalia County is affirmed.

*Affirmed.*