309 S.E.2d 32

STATE of West Virginia

v.

Gary GUM.

No. 15673.

Supreme Court of Appeals of West Virginia.

Nov. 10, 1983.

**538**

Callaghan, Callaghan, Ruckman & Vaughan and Timothy R. Ruckman, Richwood, for appellant.

Jack Alsop, Sp. Pros. Atty., Webster Springs, for appellee.

McGRAW, Chief Justice:

Gary Gum appeals from a final order of the Circuit Court of Webster County entered October 16, 1981, which confirmed his conviction for first degree murder, denied his motion for a new trial, and sentenced him to life in the penitentiary, subject to the jury's recommendation of mercy. The appellant makes thirteen various assignments of error. We fail to find merit in any of these, and therefore, we affirm his conviction.

On the morning of October 15, 1979, Eugene Gum, the appellant's brother, went hunting in a rural area of Webster County known as Jumbo with his son, Michael Gum. After hunting together for a short time, Eugene and his son separated. Upon leaving his father and after traveling some distance, Michael encountered the appellant, who was also hunting in the area. After a short conversation, Michael Gum and the appellant separated, and both continued hunting.

At approximately 11:30 a.m., Michael returned to his father's vehicle; waited for a period of time; and eventually, upon his father's failure to return, headed for home. On his way home, Michael picked up a friend, Mark Hull, and both returned to the Eugene Gum residence and ate. A short time later, after becoming concerned about his father's failure to return home, Michael and Mark Hull left to look for Eugene. Before returning to the woods, however, Michael and Mark went to the appellant's home to advise him of Eugene's failure to return, and to inquire as to whether the appellant had seen Eugene while hunting in that area.

At this point, there is conflicting testimony concerning a conversation which took place between the appellant and Mark Hull. Hull testified that, out of the presence of Michael, the appellant told him that they would find Eugene's body where Michael last saw him. When Hull asked the appellant who did it, Hull testified that the appellant replied that it was a man from Ohio. The appellant testified that no such conversation took place. Nevertheless, upon returning to the area where Michael last saw his father, he and Hull found the body of Eugene Gum. They then returned to the appellant's house, and advised him of what they had found. The appellant then called an ambulance and the police.

Subsequent investigation by law enforcement personnel revealed that Eugene Gum had been shot by a small caliber weapon, and the State Medical Examiner determined that the cause of death was a gunshot wound to the head. The police officers involved in the investigation of Eu-

gene Gum's death conducted an extensive search of the area in which the death occurred; contacted approximately forty different families in the area; requested and received from the appellant and Michael Gum all .22 caliber rifles in their possession for ballistics purposes; interviewed the appellant on several occasions and accompanied him back to the area where the body was found and where the appellant had been hunting; and requested that the appellant and Michael Gum submit to polygraph examinations. As to this final investigative effort, the results indicated that both the appellant and Michael Gum were being truthful in their responses to questions concerning their knowledge of Eugene Gum's death.

After this extensive investigation, the officers involved determined that Eugene Gum had probably died as the result of a negligent shooting by someone hunting with a .22 caliber rifle having mistaken him for a squirrel in the underbrush and heavy foilage on the trees in the area where the body was found. Therefore, on November 21, 1979, the investigation was classified as pending and as a possible negligent shooting.

Thirteen months later, however, on the evening of January 1, 1981, Gerald Gum, brother of the victim, and two of his acquaintances, Buddy Clevenger and John Postelwait, arrived at the home of one of the officers involved in the Eugene Gum investigation. John Postelwait told the officer that he had some information concerning Eugene Gum's death. Because it was obvious that Postelwait and the others had been drinking, however, the officer made arrangements to see him the next day when he was sober.

On January 2, 1981, Postelwait gave a written statement to police in which he claimed that the appellant had offered him $7000.00 to kill Eugene Gum and Dona Gum, the appellant's wife, about one month prior to Eugene Gum's death. Postelwait stated that the appellant said at that time that Eugene and Dona were blackmailing him over automobiles that the appellant had allegedly burned for the insurance money. Postelwait told police that when he refused the offer, the appellant told him that he would have his brother killed even if he had to wait until hunting season to do it himself. Postelwait testified at trial as to this conversation.

In order to insure the reliability of the information provided by Postelwait, officers requested that he submit to a polygraph examination. When results of this examination revealed irregularities, Postelwait admitted that he had not told the officers the entire story. He then told the officers that he had considered killing Eugene and Dona, but eventually decided against it. He also related that he was with the appellant when the appellant placed insulin in Eugene's beer at a tavern with the expectation that it would cause him to have a heart attack. Postelwait was then retested on the polygraph and, on the basis of this examination, the officers determined that he was being truthful.

Testimony at trial indicated that the appellant had also approached Jerry Moates, a friend of John Postelwait, and had similarly offered Moates money to kill his brother and his wife, Dona Gum. Furthermore, Mark Hull testified that he stole a bottle of insulin at the appellant's direction, but carried it around for a few days without refrigeration in order to spoil the contents before he delivered it to the appellant, because the appellant had indicated that he was going to use it to kill Eugene Gum.

Additional evidence introduced at trial indicated that for at least two months prior to Eugene Gum's death, the appellant had been having an affair with the decedent's wife, Gladys Gum; that the appellant continued to see Gladys Gum after his brother's death; that in December, 1979, the appellant separated from his wife; that in January, 1980, the appellant moved in with Gladys Gum; and that Gladys Gum applied a portion of the $50,000.00 received in life insurance monies from her husband's death to make improvements to the appellant's home.

Upon the identity of the potential murder weapon, further investigation revealed that

Bobby Hines, half brother to the appellant and Eugene Gum, had loaned the appellant a .22 caliber pistol approximately one year prior to Eugene Gum's death. The appellant returned the pistol to Hines in May, 1980, approximately seven months after Eugene Gum's death.

The trial of the case lasted for approximately three weeks with a total of thirty-seven witnesses, including the appellant, testifying. The proof offered by the State was entirely circumstantial, showing that the appellant had contacted people to kill his brother; that he had told them upon their refusal to take part in his plan that he would do it himself when hunting season arrived; that he had at least two potential motives for the killing; and that he had the opportunity and the means to accomplish the crime. At the conclusion of trial, the jury returned a verdict of murder in the first degree. The appellant presents numerous assignments of error, which we will address individually, although not in the order as presented by the appellant.

The appellant's first two assignments of error are closely related: (1) the trial court's failure to direct a verdict in the appellant's favor at the conclusion of the State's evidence, and (2) the trial court's failure to direct a verdict for the appellant at the conclusion of all the evidence.

■ With regards to the propriety of directed verdicts in criminal cases in West Virginia, this Court has stated,

" 'Upon motion to direct a verdict for the defendant, the evidence is to be viewed in light most favorable to prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.' Syllabus Point 4, *State v. Johnson*, 159 W.Va. 682, 226 S.E.2d 442 (1976)." Syllabus Point 5, *State v. Woods*, 169 W.Va. 767, 289 S.E.2d 500 (1982).

Syl. pt. 4, *State v. Oldaker*, 172 W.Va. 258, 304 S.E.2d 843 (1983).

■ As the appellant correctly notes,

"Circumstantial evidence will not support a guilty verdict, unless the fact of guilt is proved to the exclusion of every reasonable hypothesis ·of innocence; and circumstances which create only a suspicion of guilt but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction." Syllabus point 2, *State v. Dobbs*, 163 W.Va. 630, 259 S.E.2d 829 (1979).

Syl. pt. 2, *State v. Meadows*, 172 W.Va. 247, 304 S.E.2d 831 (1983).

■ Despite this additional requirement where the evidence presented at trial is circumstantial in nature, " 'If, on a trial for murder, the evidence is wholly circumstantial, but as to time, place, motive, means and conduct, it concurs in pointing to the accused as the perpetrator of the crime, he may properly be convicted.' " Syl. pt. 3, *State v. Meadows, supra, quoting,* syl. pt. 1, *State v. Bailey*, 151 W.Va. 796, 155 S.E.2d 850 (1967); *see also State v. Williams*, 172 W.Va. 295, 305 S.E.2d 251, 257 (1983). Furthermore, as the Court pointed out in syllabus point 4 of *Meadows, supra, quoting,* syl. pt. 4, *State v. Bailey, supra:* " 'The weight of circumstantial evidence, as in the case of direct evidence, is a question for jury determination, and whether such evidence excludes, to a moral certainty, every reasonable hypothesis, other than that of guilt, is a question for the jury.' "

■ In the present case, the evidence produced at trial, when viewed in the light most favorable to the prosecution, fulfills these requirements. The evidence established that the time of death was between 9:30 a.m. and 11:00 a.m. on the morning of October 15, 1979. The appellant admitted that he had been hunting in the general area where the body was found until around 9:15 a.m. that day. Both the appellant and Gladys Gum testified that they had been having an affair for approximately two months prior to Eugene Gum's death, although the appellant denied ever burning any automobiles for the insurance money. The evidence established that the appellant had in his possession a .22 caliber pistol at the time of his brother's death.

As to "time, place, motive, means and conduct," the evidence pointed to the appellant as the perpetrator of the crime. The circumstances did not create the mere suspicion of guilt. Rather, the jury determined that the evidence was sufficient to prove the commission of Eugene Gum's murder by the appellant to the exclusion of every reasonable hypothesis of innocence. We do not disagree.

The appellant's third assignment of error is the trial court's failure to suppress certain statements made by the appellant to police officers investigating Eugene Gum's death. The appellant argues that the failure of police officers investigating the death of Eugene Gum on October 15, 1979, to give him his Miranda warnings tainted both this initial and subsequent conversations with the appellant, making any information obtained through those conversations inadmissible at trial.

 In Syllabus Point 2 of *State v. Andriotto*, 167 W.Va. 501, 280 S.E.2d 131 (1981), this Court stated, "The obligation of police to warn a suspect of both his right to counsel and his right against self-incrimination applies only to custodial or other settings where there is a possibility of coercion." The conversation of which the appellant complains took place on the evening of October 15, 1979, outside the residence of Gladys Gum with other individuals present. The information which officers obtained was the fact that the appellant had been hunting in the same area as Eugene Gum, which the appellant did not deny. The appellant had not been arrested, nor had his liberty to leave been circumscribed. In *State v. Wotring*, 167 W.Va. 104, 279 S.E.2d 182, 189 (1981), this Court held that where a defendant is not in the custody of law enforcement officers, or under arrest, but is in his or her own home and presumably free to leave or to ask others to leave, Miranda warnings need not be given prior to interrogation. "A trial court's decision regarding the voluntariness of a confession will not be disturbed unless it is plainly wrong or clearly against the weight of the evidence." Syl. pt. 3, *State v. Vance*, 162 W.Va. 467, 250 S.E.2d

146 (1978). The informal questioning which took place in this case as part of the preliminary investigation of the victim's death did not take place in a custodial or coercive setting. Therefore, there was no duty to give the appellant his Miranda warnings, and the information elicited was admissible at trial.

 The appellant's fourth assignment of error is the failure of the trial court to strike a juror for cause because she allegedly overheard a conversation between the wife of a witness for the prosecution and a co-worker concerning the facts of the case. When this matter came to the attention of the trial court, it conducted a hearing to determine whether the juror had overheard any such conversation or whether there was any other type of impropriety involved. Both the juror and the wife of the State's witness, who were co-workers, testified that no conversation concerning the facts of the case took place, and that the juror took no part in any conversation between the wife of the State's witness and the co-worker. There was absolutely no evidence that the juror engaged in any conversation or overheard any conversation regarding the case. As the Court stated in Syllabus Point 4 of *State v. Audia*, 171 W.Va. 568, 301 S.E.2d 199 (1983), " 'The true test as to whether a juror is qualified to serve on the panel is whether without bias or prejudice he can render a verdict solely on the evidence under the instructions of the court.' Syl. pt. 1, *State v. Wilson*, 157 W.Va. 1036, 207 S.E.2d 174 (1974)." As in *State v. Dye*, 171 W.Va. 361, 298 S.E.2d 898, 903–905 (1982), the trial court in this case alertly conducted an examination of the juror, as well as subpoenaing and questioning the parties involved. The trial court's determination of the absence of bias or prejudice was supported by the evidence, and its denial of the appellant's motion to strike for cause was proper.

 The appellant's fifth assignment of error is the trial court's denial of his request through a bill of particulars for the production of the questions asked, the answers given, and the scientific results of two polygraph examinations given John Postelwait. Apart from the issue of the

admissibility of the results of polygraph examinations in West Virginia, "[a] prosecution that withholds evidence which if made available would tend to exculpate an accused by creating a reasonable doubt as to his guilt violates due process of law under Article III, Section 14 of the West Virginia Constitution." Syl. pt. 4, *State v. Hatfield*, 169 W.Va. 191, 286 S.E.2d 402 (1982); *see also State v. Grimm*, 165 W.Va. 547, 270 S.E.2d 173 (1980); *State v. McArdle*, 156 W.Va. 409, 194 S.E.2d 174 (1973). Equally applicable, however, is the proposition that "[s]ubject to certain exceptions, pre-trial discovery in a criminal case is within the sound discretion of the trial court ...." Syl., *State v. Moran*, 285 S.E.2d 450 (1981), *quoting*, syl. pt. 1, *State v. Dudick*, 158 W.Va. 629, 213 S.E.2d 458 (1975).

▪ The contention of the appellant that the failure of the State to give the questions asked and the answers given effectively limited his ability to prepare for trial is without merit. The record indicates that the trial court granted liberal discovery to the appellant. Furthermore, the State provided a copy of an investigatory report prepared by its officers which included two separate statements given by Postelwait, which were in effect his answers to the two separate polygraph examinations, the report contained a narrative by police officers which included such remarks as, "John Postelwait was then given [the initial] polygraph examination and this test showed irregularities in the chart. When confronted with this, John Postelwait stated he was not telling it all." The full contents of each polygraph examination were disclosed to the appellant at trial during an *in camera* hearing concerning their admissibility. No exculpatory material appeared in either of the examinations. The trial court did not abuse its discretion by its failure to require disclosure of these polygraph examinations.

▪ The appellant's sixth assignment of error is the trial court's denial of his motion to suppress the introduction of the .22 caliber pistol which he had borrowed from Bobby Hines, and which he had in his possession at the time of Eugene Gum's death. We must begin with the proposition that, "Motions to introduce and motions and objections for exclusion are addressed to the sound discretion of the court." *State v. Thomas*, 157 W.Va. 640, 657, 203 S.E.2d 445, 456 (1974); *see also State v. Messer*, 166 W.Va. 806, 277 S.E.2d 634, 636 (1981). Testimony by a forensic pathologist revealed that although the exact caliber of the gunshot causing the fatal wound could not be determined, in his opinion the fatal shot was fired from a handgun or revolver. Testimony by an investigating officer further revealed that although he asked the appellant to give him all the .22 caliber weapons in his possession, and asked him specifically if he had any pistols, the appellant did not turn over the .22 caliber pistol he had in his possession. The appellant did not deny having possession of the pistol in question at the time of his brother's death. He testified, however, that he informed the police officer of this fact, but when the officer found out that the gun did not have a scope on it, he said that he didn't want it.

▪ As a general rule, instruments or objects which were involved in the commission of a crime are admissible evidence. *State v. Painter*, 135 W.Va. 106, 63 S.E.2d 86 (1950); *State v. Baker*, 33 W.Va. 319, 10 S.E. 639 (1889). The connection between the instrument or object and the crime, however, need not be established with absolute certainty. In Syllabus Point 1 of *State v. Henry*, 51 W.Va. 283, 41 S.E. 439 (1902), this Court stated, "In the trial of an indictment for murder all instruments which the evidence *tends* to show were used in the perpetration of the crime, may be produced for the inspection of the jury." (emphasis added). Similarly, in *State v. Peterson*, 132 W.Va. 99, 107, 51 S.E.2d 78, 83 (1948), this Court said, "It is not necessary in the trial of an indictment for murder that the instrument purported to have been used in the commission of the crime be established beyond peradventure." In *State v. Bail*, 140 W.Va. 680, 700, 88 S.E.2d 634, 647 (1955), this Court upheld the trial court's determination of the admissibility of metal fragment of a bullet found in the victim's vehicle, despite the fact that it was

not shown to have been fired from the gun of the defendant, or to be the bullet which actually killed the victim. Finally, in *State v. Buck*, 170 W.Va. 428, 294 S.E.2d 281 (1982), this Court held that the admission of a club found in the defendant's car was not erroneous despite testimony by a codefendant that the defendant used a tire iron to strike the victim of an aggravated robbery. In accordance with this line of cases, we find no error in the admission of the .22 caliber pistol in the present case.

The appellant's seventh and eighth assignments of error are closely related, and will be dealt with accordingly. First, the appellant asserts that the trial court erred in allowing the State to introduce testimony to the effect that he had burned automobiles for the insurance money. Second, the appellant complains of the admission into evidence of testimony concerning his alleged attempts to hire two of the State's witnesses to kill his wife, Dona Gum. The appellant points to the well recognized rule in West Virginia that,

> Subject to exceptions, it is a well-established common-law rule that in a criminal prosecution, proof which shows or tends to show that the accused is guilty of the commission of other crimes and offenses at other times, even though they are of the same nature as the one charged, is incompetent and inadmissible for the purpose of showing the commission of the particular crime charged, unless such other offenses are an element of or are legally connected with the offense for which the accused is on trial.

Syl. pt. 11, *State v. Thomas*, 157 W.Va. 640, 203 S.E.2d 445 (1974); *see also State v. Ruddle*, 170 W.Va. 669, 295 S.E.2d 909 (1982); *State v. Headley*, 168 W.Va. 138, 282 S.E.2d 872 (1981); *State v. Compton*, 167 W.Va. 16, 277 S.E.2d 724 (1981); *State v. Moore*, 166 W.Va. 97, 273 S.E.2d 821 (1980); *State v. Harris*, 166 W.Va. 72, 272 S.E.2d 471 (1980); *State v. Haverty*, 165 W.Va. 164, 267 S.E.2d 727 (1980); *State v. Hudson*, 128 W.Va. 655, 37 S.E.2d 553 (1946).

It is also well established, however, that,

> The exceptions permitting evidence of collateral crimes and charges to be admissible against an accused are recognized as follows: the evidence is admissible if it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the others; and (5) the identity of the person charged with the commission of the crime on trial.

Syl. pt. 12, *State v. Thomas, supra; see also State v. Pancake*, 170 W.Va. 690, 296 S.E.2d 37 (1982); *State v. Ruddle, supra; Blackburn v. State*, 170 W.Va. 96, 290 S.E.2d 22 (1982); *State v. Caudill*, 170 W.Va. 74, 289 S.E.2d 748 (1982); *State v. Ward*, 168 W.Va. 385, 284 S.E.2d 881 (1981); *State v. Underwood*, 168 W.Va. 52, 281 S.E.2d 491 (1981); *State v. Barker*, 168 W.Va. 1, 281 S.E.2d 142 (1981); *State v. Rector*, 167 W.Va. 748, 280 S.E.2d 597 (1981).

Obviously, the admission of testimony concerning the alleged blackmailing of the appellant by his brother and his wife over the burning of automobiles for the insurance money went to establish motive, and not his propensity toward criminality. Therefore, the admission of such testimony was permissible under the first exception in *Thomas*.

As to the admissibility of testimony concerning the attempted procurement by the appellant of two of the State's witnesses to kill his wife, this case bears a marked resemblance to the facts in *Blackburn v. State, supra*. In that case, the defendant had been convicted of being an accessory before the fact to the crime of arson involving the home of his wife's former husband's father. The arson itself was merely part of a larger vendetta on the part of Blackburn against his wife's former husband after he brought abduction charges against Blackburn and his wife stemming from the kidnapping of his daughter. The evidence indicated that Blackburn, through an intermediary, had hired several persons to commit assaults against his wife's former husband to intimidate him into dropping these abduction charges. After these attacks failed to yield the results desired, Blackburn, through the same intermediary,

employed one of the assailants to commit arson on his wife's former father-in-law's home. The State also introduced testimony that Blackburn, again acting through this same intermediary, had solicited others to intimidate or murder his ex-wife, who in an unrelated matter had instituted child support proceedings against him. 170 W.Va. at 101, 290 S.E.2d at 28.

■ This Court held that the collateral crimes evidence concerning the attempted procurements of assaults against Blackburn's wife's former husband and against his former wife were admissible as tending to establish both motive and common scheme or plan. We stated,

> The crimes alleged to have been committed against Camerson McCallister [Blackburn's wife's former husband] were certainly not unrelated to the crime with which the appellant was charged. The evidence that the appellant abducted the McCallister child, for example, established the appellant's motive for hiring someone to commit the arson. The evidence of motive was bolstered by testimony that the arson was conceived after the malicious wounding of Camerson McCallister failed to achieve the purposes of the appellant. In addition, the evidence that the appellant had procured the malicious wounding and the attempted murder of Camerson McCallister and had solicited others to kill his former wife tended to establish that the appellant had devised a systematic strategy for dealing with legal difficulties caused by estranged or extended family members.

290 S.E.2d at 28. Similarly, in the present case, the introduction of testimony concerning the appellant's attempts to procure the murder of his wife bolstered testimony concerning the appellant's potential motives and tended to establish a common scheme or plan for the demise of both the appellant's brother, Eugene Gum, and his wife, Dona Gum.

■ The appellant's ninth assignment of error is admission into evidence of a prior criminal charge in which one of his witnesses was acquitted of murder by reason of insanity. In examining this issue, we must begin with the proposition that, " 'The extent of the cross-examination of a witness is a matter within the sound discretion of the trial court; and in the exercise of such discretion, in excluding or permitting questions on cross-examination, its action is not reviewable except in case of manifest abuse or injustice.' Syl. pt. 4, State v. Carduff, 142 W.Va. 18, 93 S.E.2d 502 (1956)." Syl., State v. Wood, 167 W.Va. 700, 280 S.E.2d 309 (1981); see also State v. Richey, 171 W.Va. 342, 298 S.E.2d 879 (1982).

In Syllabus Point 3 of State v. Woods, 155 W.Va. 344, 184 S.E.2d 130 (1971), this Court stated, "Questions may be asked of witnesses as to convictions, both felonies and misdemeanors, in order to test the witness' credibility." In Syllabus Point 1 of State v. McAboy, 160 W.Va. 497, 236 S.E.2d 431 (1977), this Court limited the types of crimes that may be used to impeach a criminal defendant's credibility: "In the trial of a criminal case, a defendant who elects to testify may have his credibility impeached by showing prior convictions of perjury or false swearing, but it is impermissible to impeach his credibility through any other prior convictions." The Court, however, made clear that this new rule concerning "the use of prior criminal convictions to impeach the defendant if he elects to testify is not meant to alter our existing law in regard to other witnesses. As to such other witnesses, the rule is that it rests within the sound discretion of the trial court . . . ." 160 W.Va. at 507–508, 236 S.E.2d at 437.

The difficulty in the present action is that there was no conviction present. In essence, the witness had been acquitted of the criminal charges through the jury's verdict of not guilty by reason of insanity. Understandably, other courts have held that verdicts of not guilty by reason of insanity are not admissible as prior conviction impeachment evidence. See Colton v. Manson, 463 F.Supp. 1252 (D.Conn.1979); State v. Colton, 174 Conn. 135, 384 A.2d 343 (1977).

■ Similarly, evidence of the witness' acquittal by reason of mental illness was insufficient to show a psychiatric disability

affecting his credibility. In Syllabus Point 5 of *State v. Harman*, 165 W.Va. 494, 270 S.E.2d 146 (1980), this Court held that although

> [e]vidence of psychiatric disability may be introduced when it effects the credibility of a material witness' testimony in a criminal case[,] [b]efore such psychiatric disorder can be shown to impeach a witness' testimony, there must be a showing that the disorder effects the credibility of the witness and that the expert has had a sufficient opportunity to make the diagnosis of psychiatric disorder.

No such showings were made in this case, probably because the State was not attempting to show any specific psychiatric disability, but only that the witness had been found not guilty by reason of mental illness only two months prior to the events to which he testified.

 Despite these considerations, however, the admission of evidence concerning the witness' acquittal by reason of mental illness does not automatically constitute reversible error. In Syllabus Point 2 of *State v. Atkins*, 163 W.Va. 502, 261 S.E.2d 55 (1979), *cert. denied*, 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980), this Court stated,

> Where improper evidence of a nonconstitutional nature is introduced by the State in a criminal trial, the test to determine if the error is harmless is: (1) the inadmissible evidence must be removed from the State's case and a determination made as to whether the remaining evidence is sufficient to convince impartial minds of the defendant's guilt beyond a reasonable doubt; (2) if the remaining evidence is found to be insufficient, the error is not harmless; (3) if the remaining evidence is sufficient to support the conviction, an analysis must then be made to determine whether the error had any prejudicial effect on the jury.

The testimony of the appellant's witness in this case was an extremely minor portion of his defense. On direct examination, this witness merely testified that he had seen two hunters enter the woods in the general vicinity of where Eugene Gum had been hunting. He was uncertain of the time the men entered the woods, although he estimated it to have been between 9:00 a.m. and 11:30 a.m. He could not tell what kind of guns they were carrying and he could not identify the men. In fact, on cross-examination, he admitted that the vehicle in which the two men arrived could have been the appellant's.

It is clear that even taking everything the witness testified to as true, the remaining evidence was sufficient to support the appellant's conviction. The fact that other hunters could have been hunting in the same general area as Eugene Gum does not explain away the substantial circumstantial evidence pointing to the appellant as the perpetrator of the crime charged. Additionally, the appellant voiced no specific objection at trial nor alleges any prejudicial effect on appeal which would support a conclusion that the testimony elicited affected the outcome of the case. Finally, the State did not emphasize this testimony either upon cross-examination or upon its closing arguments to the jury. Therefore, any error committed in allowing the State to question the appellant's witness concerning his acquittal by reason of mental illness was harmless under *Atkins*.

 The appellant's tenth and eleventh assignments of error are closely related, and will be analyzed together. The first is the trial court's refusal to admit into evidence the questions asked, the answers given, and the scientific results of the two polygraph examinations given to John Postelwait. The second is the trial court's refusal to admit into evidence the questions asked, the answers given, and the scientific results of a polygraph examination which was given to the appellant. As previously noted, the trial court conducted an *in camera* hearing to determine the admissibility of these polygraph examinations, and the record reveals that, apart from the results, no exculpatory material appeared therein. Both of these assignments of error are controlled by Syllabus Point 2 of *State v. Frazier*, 162 W.Va. 602, 252 S.E.2d 39 (1979), which stated, "Polygraph test results are not admissible in evidence in a criminal trial in this State." Nothing has

changed between our thorough discussion of the issue of the admissibility of polygraph results in *Frazier* and the present case which indicates that their reliability has improved. Therefore, the trial court's refusal to admit the results of the polygraph examinations given in this case was proper.

■ The appellant's final two assignments of error can be addressed together. First, he contends that the trial court erred in giving State's Instructions No. 1, 2, 4, 6, 7, and 8. A review of the record reveals, however, that all of these instructions correctly stated applicable rules of law in accordance with our most recent cases on each particular point. Second, the appellant contends that the trial court erred in refusing to give Defendant's Instructions No. 5, 19, 27, 29, and 31. As to the Defendant's Instructions No. 5, 19, 27, and 29, each of these instructions were repetitious of other instructions tendered by the appellant or by the State and given by the trial court. In Syllabus Point 2 of *State v. Lott*, 170 W.Va. 65, 289 S.E.2d 739 (1982), *quoting* Syl. pt. 4, *State v. Johnson*, 157 W.Va. 341, 201 S.E.2d 309 (1973), this Court stated, " 'Where instructions given clearly and fairly lay down the law of the case, it is not error to refuse other instructions on the same subject. The court need not repeat instructions already substantially given.' Syllabus Point 4, *State v. Bingham*, 42 W.Va. 234, 24 S.E. 883 (1896)." For this reason, the trial court correctly refused to give the appellant's repetitious instructions offered in this case.

■ In addition to the four repetitious instructions, the trial court also refused to give Defendant's Instruction No. 31, which instructed the jury that the possible verdicts were murder in the first degree, murder in the second degree, voluntary manslaughter, involuntary manslaughter, and not guilty. State's Instruction No. 8, which was given by the trial court, listed the possible verdicts as murder in the first degree, murder in the second degree, and not guilty. In Syllabus Point 5 of *State v. Demastus*, 165 W.Va. 572, 270 S.E.2d 649 (1980), this Court stated, "Jury instructions on possible verdicts must only include

those crimes for which substantial evidence has been presented upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt." Similarly, in Syllabus Point 1 of *State v. White*, 171 W.Va. 658, 301 S.E.2d 615 (1983), we stated, " 'An instruction to the jury is proper if it is a correct statement of the law and if sufficient evidence has been offered at trial to support it.' Syllabus Point 8, *State v. Hall*, 171 W.Va. 212, 298 S.E.2d 246 (1982)." Not only were the theories of voluntary and involuntary manslaughter unsupported by "substantial evidence" in this case, there was virtually no evidence presented to support such instructions. The appellant did not contend that he was provoked or that he unintentionally killed his brother, his defense was clearly one of simple denial. Therefore, the trial court was justified in refusing to instruct the jury on voluntary and involuntary manslaughter as possible verdicts.

Accordingly, for the reasons set forth above, the judgment of the Circuit Court of Webster County is affirmed.

Affirmed.