425 S.E.2d 616

**STATE of West Virginia, Appellee,**

v.

**Jack Earl WALKER, Appellant.**

**No. 21023.**

Supreme Court of Appeals of
West Virginia.

Submitted Sept. 8, 1992.

Decided Dec. 17, 1992.

Stephen D. Herndon, Wheeling, for appellant.

Richard M. Gutmann, Asst. Atty. Gen., for appellee.

NEELY, Justice:

In this appeal the defendant was convicted of felony murder and arson and was sentenced to life without mercy. Although standing alone the errors defendant assigns might be harmless, the cumulative effect of numerous errors hopelessly tainted the first trial. Therefore, we reverse the conviction and remand the case for a new trial.

## I.

On 9 May 1989, a dark, rainy night, a fire broke out at Mary Sherwood's residence on Elk Fork Road in Tyler County (about a mile from the Wetzel County border). After firefighters battled the blaze for several hours, rescuers were finally able to search the house for survivors. The only body they found was that of Ms. Sherwood, her remains burned beyond recognition. An autopsy discovered a bullet fragment in Mrs. Sherwood's head. It is clear that either the bullet wound or the fire would have caused Mrs. Sherwood's death. As the coroner, Dr. Sopher, noted:

[T]he only other injury ... to the body other than that due to fire and heat was a gunshot wound to the head.... [I]n time, the gunshot wound would have resulted in death without a question; however, the actual cause of death, in the final analysis after the examination, was not the injury to the head but that she had died in the fire of smoke and soot inhalation.

Transcript, 21 March 1990, at 127.

Fire marshals examined the house after the fire was extinguished and concluded that the fire was likely caused by arson because there were five disconnected circular "burn-through" spots in the floor. No traces of accelerant were found, but the fire marshal indicated that it was not unusual for all traces of accelerant to be burned up in a fire of that intensity.

As the fire burned, a small crowd gathered to watch the firefighters extinguish the blaze. Sheriff Adams of Wetzel County along with Sheriff Keller and Deputy Kendle from Tyler County arrived at the scene. Several witnesses indicated to the officers that they had seen a two-toned blue car driving in the area earlier that day, and the witnesses also mentioned that the car had one headlight out and made a squealing noise. One witness, Mrs. Leek, said she had seen a car come "flying out of Mary's lane." Mrs. Leek described the car as being the same as the one she and her husband had seen earlier in the day. After being shown the car driven by Mr. Walker, Mrs. Leek identified it as the car she had seen earlier. Sheriff Adams recognized the car as Mr. Walker's.

After this identification of the car, Sheriff Keller interviewed Mr. Walker. The Sheriff read Mr. Walker the *Miranda* warnings and informed Mr. Walker that he was considered a suspect. The Sheriff then swabbed Mr. Walker's hands, searching for traces of accelerant. Laboratory tests later revealed that there was no accelerant on Mr. Walker's hands, no evidence of gunpowder residue, and no indication that Mr. Walker's hands had been recently washed. After asking Mr. Walker a few more questions, Sheriff Keller allowed Mr. Walker to go home.

Mr. Walker (who was admittedly in the area on the day of the fire) maintains that he had been in the neighborhood looking for a lost coon dog. Mr. Walker was back that night, looking for a fan belt or alternator belt that he thought he had lost that day. That missing belt was the cause of the squealing emanating from his car. Mr. Walker's car had one headlight out, as well. However, one of the strongest elements of circumstantial evidence tending to incriminate Mr. Walker was that he was five miles from his home and present among the crowd when the fire was burning—typical behavior for an arsonist.

Mr. Walker was convicted of both felony murder and arson. The State waived sentencing on the arson, but Mr. Walker was sentenced to life without mercy on the murder charge. Mr. Walker now asserts here that: (1) The court erred by instructing the jury only on felony murder; (2) the court erred in failing to grant a directed verdict or judgment notwithstanding the verdict due to the vague, circumstantial nature of the evidence; (3) the court erred in admitting evidence of unrelated weapons and unrelated conduct; (4) the court erred in admitting into evidence damning hearsay testimony and an inaccurate videotape; and (5) the court failed to grant a motion to change venue, failed to allow individual *voir dire* by counsel, and failed to grant a mistrial because a prospective juror declared that he believed Mr. Walker was

guilty in front of the rest of the prospective jury panel.

## II.

The prosecution began its case by asserting a theory of premeditated murder. In his opening argument, the prosecutor made it clear that the State was trying to convict Mr. Walker of premeditated murder:

> Now, the indictment in this case which is an accusation charges that Jack Walker willfully and maliciously killed, slain, [sic] and murdered Mary Sherwood and committed first degree arson by maliciously and willfully setting fire to her house on May 9th of last year.

Transcript, 19 March 1990, at 88. However when it came time for the jury instructions, the State offered instructions only on felony murder and arson, not premeditated murder. The jury subsequently convicted Mr. Walker of both felony murder and the underlying felony of arson. Although the State waived sentencing on the arson conviction, the arson conviction was still entered against Mr. Walker's record.

■ The conviction of Mr. Walker on both felony murder and arson charges was impermissible:

> "Double jeopardy prohibits an accused charged with felony murder, as defined by *W.Va.Code* § 61-2-1 (1977 Replacement Vol.,) from being separately tried or punished for both murder and the underlying enumerated felony." Syllabus point 8, *State v. Williams*, [172] W.Va. [295], 305 S.E.2d 251 (1983).

Syl. pt. 8, *State v. Giles*, 183 W.Va. 237, 395 S.E.2d 481 (1990). The State admits that the case should be remanded for the trial court to correct the arson conviction. Mr. Walker, however, contends something more fundamental is wrong with the way that the charge was shifted from premeditated murder to felony murder. First, Mr. Walker asserts that the shift caused evidence to be introduced against him that was irrelevant. Second, the shift prohibited him from having the jury instructed concerning the lesser-included offenses under a premeditated murder indictment, such as second-degree murder and manslaughter. Finally, the shift precluded him from raising a possible defense.

■ In order to prevent double jeopardy problems when a defendant is charged with felony murder, we held in Syl. pt. 9 of *Giles, supra,* that:

> In a prosecution for first-degree murder, the State must submit jury instructions which distinguish between the two categories of first-degree murder—willful, deliberate, and premeditated murder and felony-murder—if, under the facts of the particular case, the jury can find the defendant guilty of either category of first-degree murder. When the State also proceeds against the defendant on the underlying felony, the verdict forms provided to the jury should also reflect the foregoing distinction so that, if a guilty verdict is returned, the theory of the case upon which the jury relied will be apparent.

However, the *Giles* decision contemplated a situation where the State did not elect between premeditated murder and felony murder, but offered a general jury instruction for first-degree murder that encompassed both theories.

■ In this case, the State elected only to proceed on felony murder, not on premeditated murder. Although we have no case law in West Virginia on the time at which an election between premeditated murder and felony murder must be made by the State, several other jurisdictions have considered this issue. The best reasoned view is that the State need not make an election before the close of all evidence, if such an election is to be made at all, so long as the accused is not harmed by the lack of notice. As the Arizona Supreme Court wrote:

> While it is, of course, possible that an accused may be taken by surprise if an information charges him under one subsection of [the criminal code] and the proof offered brings the offense under another subsection, if the accused has received notice of such a possibility he is not prejudiced thereby.

*State v. Klem*, 108 Ariz. 349, 350, 498 P.2d 216, 217 (1972). However, our holding in

*Giles, supra,* clearly indicates that in appropriate circumstances, both theories may be presented to the jury with proper instructions.

■ A defendant, however, has the right to ask for an election and to ask for an earlier election than at the close of all the evidence, but the court need order the election only if the defendant can make a strong, particularized showing of how he will be prejudiced if the prosecutor either does not elect at all or waits until the end of the trial to decide what the exact charges will be. It is within the discretion of the circuit court whether to force the prosecutor to elect, and such a decision will not be reviewed unless the court abuses his discretion.

■ In Mr. Walker's situation, we fail to see how he was harmed by the State's election to charge him only with felony murder. Mr. Walker was not precluded from presenting any defenses. He defended both the arson charge and the premeditated murder charge, with an alibi defense. Although Mr. Walker could have been prejudiced had he chosen to make a self-defense claim (or some other justifiable homicide defense where he would have had to admit the killing), Mr. Walker was not deprived of the opportunity to raise any defenses nor was he tricked into admitting something as a defense. *See State v. Neider,* 170 W.Va. 662, 295 S.E.2d 902 (1982).

■ The only thing Mr. Walker was deprived of was a jury instruction concerning the lesser offenses included within a premeditated murder indictment. However, if the prosecutor can make a valid felony murder case, then there is no error in the court's giving only the felony murder charge to the jury.

### III.

Mr. Walker assigns error to the court's denial of his motion for a directed verdict and judgment notwithstanding the verdict. Mr. Walker claims that the entirely circumstantial nature of the evidence against him

required the trial court to dismiss all charges.

■ In order to survive a defendant's motion for a directed verdict (or judgment notwithstanding the verdict), the State does not need to present a large amount of incriminating evidence:

> Upon motion to direct a verdict for the defendant, the evidence is to be viewed in [a] light most favorable to [the] prosecution. It is not necessary in appraising its sufficiency that the trial court or reviewing court be convinced beyond a reasonable doubt of the guilt of the defendant; the question is whether there is substantial evidence upon which a jury might justifiably find the defendant guilty beyond a reasonable doubt.

Syl. pt. 1 *State v. Gum,* 172 W.Va. 534, 309 S.E.2d 32 (1983).

■ However, the State must pass a higher threshold when the case against a defendant is based wholly on circumstantial evidence:

> Circumstantial evidence will not support a guilty verdict, unless the fact of guilt is proved to the exclusion of every reasonable hypothesis of innocence; and circumstances which create only a suspicion of guilty [sic] but do not prove the actual commission of the crime charged, are not sufficient to sustain a conviction.

Syl. Pt. 2, *State v. Gum, supra.* This higher threshold, however, does not foreclose the possibility of a murder conviction being based wholly on circumstantial evidence:

> If, on a trial for murder, the evidence is wholly circumstantial, but as to time, place, motive, means and conduct, it concurs in pointing to the accused as the perpetrator of the crime, he may properly be convicted.

Syl. pt. 3, *State v. Gum, supra.*

■ It is permissible for a jury to infer guilt from circumstantial evidence, so long as the evidence properly points to the defendant with regard to time, place, motive, means and conduct. Given the requirement that we must look at all evidence in the light most favorable to the State, we

find that a plausible reading of the evidence implicates Mr. Walker. Therefore the failure to grant a directed verdict or judgment notwithstanding the verdict was not error.

## IV.

 The major problem in this case is the large quantity of improperly admitted evidence. Although admission of some of the evidence of which Mr. Walker complains might have been harmless standing alone, the cumulative effect of such a multitude of errors taints the entire trial. As we held in *State v. Smith:*

> Where the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.

Syl. pt. 5, *State v. Smith,* 156 W.Va. 385, 193 S.E.2d 550 (1972).

 Here, significant pieces of evidence were improperly admitted. When the circumstantial nature of the evidence requires the jury to construct a chain of logical inferences in order to find guilt, strict adherence to the rules of evidence becomes crucially important. As we held in *State v. Atkins,* the definitive case on harmless error in West Virginia, an error is less likely to be harmless "[i]f the case contains a number of substantial key factual conflicts or *is basically a circumstantial evidence case.*" 163 W.Va. 502, 515, 261 S.E.2d 55, 63 (1979), *cert. denied* 445 U.S. 904, 100 S.Ct. 1081, 63 L.Ed.2d 320 (1980).

### A.

 The State introduced evidence about a .357 Magnum revolver, brass cartridge cases, ammunition, and other firearm accessories that were found in Mr.

Walker's house at the time of his arrest. Many West Virginians have guns and ammunition in their houses, and Mr. Walker's possession of his weaponry was completely lawful. Furthermore, the evidence clearly established that the only small caliber ammunition in Mr. Walker's possession (of the same caliber as the bullet found in Mrs. Sherwood) had a silver wash, while the bullet found in Mrs. Sherwood's body had a copper wash. Therefore, there was no probative value whatsoever in admitting testimony concerning Mr. Walker's firearms. The only purpose of such testimony was to create the impermissible inference that Mr. Walker must be a dangerous person solely because he possessed guns and ammunition, notwithstanding that the right to keep and use arms is guaranteed to every citizen by *W.Va. Const., Art.* III, § 22. "Evidence which is not relevant is not admissible." *West Virginia Rules of Evidence* Rule 402.

### B.

 Much inadmissible testimony was elicited from people in the general area of the crime to the effect that Mr. Walker had knocked on their doors, identified himself, and asked permission to search for his lost coon dog on their property. Furthermore, these neighbors implied that strange things happened within a couple of weeks of Mr. Walker's visits: a stone jar mysteriously appeared; a jar mysteriously disappeared (not the same jar); and a lock was changed on a door. From this evidence, the prosecution attempted to show that because Mr. Walker had been seen in the area around the time of the fire it was logical to infer that he set the fire.[1]

 Generally, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportu-

---

**1.** The only alleged collateral act that related specifically to the burning of buildings was the statement of Paul Workman that he had seen Mr. Walker around his house the day before his house mysteriously burned. Mr. Workman's house burned on the morning of the same day

that Mrs. Sherwood was killed. However, other than the defendant's having been in the area the day before that fire, there is absolutely no evidence that ties Mr. Walker to the Workman fire. Admission of this evidence was not probative although it was highly prejudicial.

nity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. W.Va.R.Evid. 404(b)." Syl. pt. 1 *State v. Edward Charles L., Sr.*, 183 W.Va. 641, 398 S.E.2d 123 (1990). Although the State now claims that the purpose of admitting evidence of Mr. Walker's visits to area residents and subsequent mysterious happenings was not to show Mr. Walker's bad character and his conformity therewith, in his opening argument, the prosecutor said, "We're going to show you that he had a habit of lurking around the homes of the elderly in this county and nearby Wetzel County." Transcript, 19 March 1990, at 91. If the prosecutor had succeeded in showing a consistent pattern of unlawful behavior on the part of Mr. Walker, then evidence of visits to other houses would have been admissible because it showed a plan. But here, there was no proof that the bad things that happened when Mr. Walker showed up were actually caused by Mr. Walker.[2]

### C.

■ The State introduced evidence from Tim Glasscock that four or five months before the fire the defendant had made a statement that if anyone "pissed him off, he would burn them down":

Q: Tim, did you engage in conversation with Jack [Walker] from time to time?

A: Oh, yeah.

Q: Did you ever hear him talk about burning any property?

A: One time.

Q: What did he say?

[Objection made by defense and overruled by the court]

A: He said that at one time, if anything pissed him off, he would burn them down.

■ Generally, when dealing with the question of the remoteness of a threat, we defer to the judgment of the circuit court:

Whether evidence offered is too remote to be admissible upon the trial of a case is for the trial court to decide in the

exercise of sound discretion; and its action in excluding or admitting the evidence will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion.

*State v. Duell*, 175 W.Va. 233, 241, 332 S.E.2d 246, 254 (1985) (quoting Syl. pt. 5, *Yuncke v. Welker*, 128 W.Va. 299, 36 S.E.2d 410 (1945)). However such discretion does not mean that we will permit the admission of all such threats *carte blanche*. Normally, there must be some clear link between the threat made and the ultimate victim. For example, in *Duell, supra (Accord, State v. McCarty*, 184 W.Va. 524, 401 S.E.2d 457 (1990) (*per curiam*); *State v. Berry*, 176 W.Va. 291, 342 S.E.2d 259 (1986) (*per curiam*)), we held that direct threats against specific persons were enough to overcome concerns about remoteness. This type of evidence of threats is usually used to prove premeditation.

In this case, the threat admitted at trial was made "in the air," so to speak. It was not aimed at the victim or any other specific person, but merely came up in casual conversation. Furthermore, the statement was made at least four months before the burning of Mrs. Sherwood's house, so it was clearly remote from the time of the actual crime. Everyone says foolish things from time to time; we need something more than just idle chatter to convict a person of murder.

### D.

■ The State introduced hearsay testimony from Marie Workman that Mrs. Sherwood said she was visited by "A man named Miller from Wick," as well as testimony from Betty Shreve that Mrs. Sherwood had told her that a very nice man had been around her house earlier that day looking for a big black dog. This latter statement was particularly important because there was admissible evidence that when Mr. Walker went snooping around

---

**2.** Because the testimony concluding these collateral acts is not admissible, the assignment of error concerning the witnesses' identifications

of Jack Walker in photographs is rendered moot.

other peoples' land he always said he was looking for a lost dog.

Both of these statements were allegedly made during the course of telephone conversations between the testifying witnesses and Mrs. Sherwood. Rule 804(b)(5) of the *West Virginia Rules of Evidence* permits a hearsay statement by an unavailable declarant to be admitted only if the statement to be admitted has guarantees of trustworthiness equal to the other, generally recognized hearsay exceptions. Furthermore, the U.S. *Constitution* demands a showing of reliability for hearsay evidence: "[E]ven though the unavailability requirement has been met, the Confrontation Clause mandates the exclusion of evidence that does not bear adequate indicia of reliability." Syl. pt. 5, *State v. James Edward S.,* 184 W.Va. 408, 400 S.E.2d 843 (1990).

The U.S. Supreme Court in *Idaho v. Wright,* 497 U.S. 805, 821, 110 S.Ct. 3139, 3150, 111 L.Ed.2d 638 (1990) held that evidence offered under the residual hearsay clauses (Rule 803(24) and Rule 804(b)(5)) is presumptively unreliable because it does not fall within an explicit hearsay exception. We adopted this holding in Syl. pt. 6, *State v. James Edward S., supra:*

> Under the requirements of the Confrontation Clause contained in the Sixth Amendment to the United States Constitution, evidence offered under the residual hearsay exceptions contained in Rule 803(24) and Rule 804(b)(5) of the West Virginia Rules of Evidence is presumptively unreliable because it does not fall within any firmly rooted hearsay exception, and, therefore, such evidence is not admissible. If, however, the State can make a specific showing of particularized guarantees of trustworthiness, the statements may be admissible. In this regard, corroborating evidence may not be considered, and it must be found that the declarant's truthfulness is so clear that cross-examination would be of marginal utility.

The State has not made a particularized showing that the hearsay statements purportedly made by Mrs. Sherwood are reliable based upon particularized guarantees of trustworthiness within the statement. Therefore the admission of these statements was error.

### E.

Also admitted during the trial was a videotape of the fire, as shot by Janet Higgenbotham, the wife of a firefighter. Part way through the videotaping, Mrs. Higgenbotham pressed the strobe button on her camera. This slowed down the speed of the tape, thus decreasing the light necessary to record the scene. However, this effect decreased the accuracy of the scene depicted in the videotape by heightening the dramatic effects of the fire.

*West Virginia Rules of Evidence* Rule 1001(2) states that videotapes are to be treated for evidentiary purposes like photographs. One requirement for a photograph to be admitted is that the picture must accurately depict what it is purported to represent. *Syl. pt. 2, State v. Dunn,* 162 W.Va. 63, 246 S.E.2d 245 (1978). There is nothing about the videotape that is particularly disturbing. It merely shows a house-fire burning. The stroboscopic effect is not very noticeable. A warning to the jury about the strobing effect would be sufficient to overcome any possible inaccuracies.

### V.

It appears that there was a significant amount of hostility towards Mr. Walker due to the reports in the *Tyler Star News.* However, unless a clear showing can be made that the trial court abused his discretion, we will not overturn his ruling on a change of venue. "Widespread publicity, of itself, does not require change of venue, and neither does proof that prejudice exists against an accused, unless it appears that the prejudice against him is so great that he cannot get a fair trial." Syl pt. 2 *State v. Young,* 173 W.Va. 1, 311 S.E.2d 118 (1983) (quoting Syl. pt. 1, *State v. Gangwer,* 169 W.Va. 177, 286 S.E.2d 389 (1982)). In order to receive a change of venue, a defendant must show that there is "a present hostile sentiment against an ac-

cused, extending throughout the entire county in which he is brought to trial." *State v. Young*, 173 W.Va. at 9, 311 S.E.2d at 127 (quoting Syl. pt. 1, *State v. Peacher*, 167 W.Va. 540, 280 S.E.2d 559 (1981)).

 In this case, Mr. Walker submitted numerous articles (both factual and opinion articles) that depicted him as guilty. Mr. Walker also submitted a threatening letter received by his wife along with eighteen affidavits from people who believed that hostile sentiment existed in Tyler County against Jack Walker. The State, however, submitted fifty-one affidavits, forty-seven of which contained statements that there was no reason why Jack Walker could not be given a fair trial.[3] The circuit court denied the motion for change of venue, stating:

> [A]t the time of impanelling a jury, the Court can readily make that determination as to whether a jury, being an impartial jury, can be impanelled for which to assure the Defendant is to receive a fair trial.

Transcript, 21 September 1989, at 14.

When it came to impanelling the jury in Mr. Walker's case, however, the court did not give the defense an opportunity to conduct extensive *voir dire*. The circuit court did ask "Any member of this panel know anything at all about this case from what you've read, heard, discussed or otherwise?" Transcript, 19 March 1990, at 25. Virtually every member of the venire panel had at least heard about the crime or read about it in the paper. At that point, the circuit court asked the perfunctory "Did you form any opinion as to Mr. Walker's guilt or innocence?" question, rather than specifically inquiring about what had been read and heard by the prospective jurors. Furthermore the court did not allow the defendant's lawyer to question prospective jurors separately, notwithstanding a strong prima facie showing of hostile sentiment and bias.

The *voir dire* in the first trial was inadequate. At the new trial, the current extent of hostile sentiment in Tyler County must be measured. If sentiment is so hostile that fair jurors cannot be found, the trial must be moved. In any event, the circuit court should ask questions that elicit responses that will help determine the extent of bias, and that means going beyond asking if a prospective juror can set aside his knowledge.[4]

## VI.

For the foregoing reasons, the judgment of the Circuit Court of Tyler County is reversed, and this case is remanded for a new trial.

Reversed and remanded.

---

**3.** Nearly half of those respondents were at least familiar with Mr. Walker and the crimes with which he was charged.

**4.** Reversal on other grounds renders moot whether failure to deny a mistrial was reversible error and all questions concerning ineffective assistance of counsel.